**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David A. FELDMAN,
Defendant-Appellant.**

No. 82–1611.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 7, 1983.

Decided June 29, 1983.

As Amended Aug. 4, 1983.

Rehearing Denied Aug. 18, 1983.

Certiorari Denied Oct. 31, 1983.
See 104 S.Ct. 352.

John R. Wing, Weil, Gotshal & Manges, New York City, for defendant-appellant.

Robert W. Tarun, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL and ESCHBACH, Circuit Judges, and NEAHER, Senior District Judge.*

ESCHBACH, Circuit Judge.

David A. Feldman appeals his conviction on nineteen counts of mail fraud and nine counts of wire fraud, all stemming from an alleged scheme to defraud Merrill Lynch, Pierce, Fenner and Smith, Inc. ("Merrill Lynch") by using false bank guarantee letters to fulfill the collateral requirements for trading in stock options. For the reasons below, we affirm.

I

According to the evidence taken in the light most favorable to the government, David A. Feldman and George Edgar Joyner executed false bank guarantees which enabled them to trade in stock options through Merrill Lynch without providing the collateral Merrill Lynch required to ensure that any options that were exercised would be covered.

Feldman and Joyner were neighbors in early 1977 when Feldman was employed with Merrill Lynch in Chicago and Joyner, a certified public accountant, was a controller for Brinks Incorporated. After discussing the options market on several occasions, they entered into an investment partnership in which each had a fifty percent interest. The written partnership agreement was later changed, omitting references to Feldman's interest and showing the two partners as Joyner and his wife, because Merrill Lynch's policy prohibited account executives from having a financial interest in a customer's account. Nevertheless, throughout the duration of the partnership, Feldman and Joyner split evenly all profits and expenses.

In March 1977, Feldman was transferred to Hollywood, California, where he became Branch Manager. Feldman continued his contacts with Joyner regarding options trading, and in July 1977, came to Chicago where Joyner introduced him to Harold Dillenbach, Joyner's banker at Harris Trust and Savings Bank. Feldman explained their plan to trade in "put" options, *i.e.*, options to sell, and requested that the bank provide them with guarantee letters to satisfy Merrill Lynch's collateral requirement. When Feldman left Chicago after the meeting, the prospects for bank guarantees did not seem promising.

After Harris Trust and Savings informed Joyner that it would not provide guarantee letters, Feldman sent Joyner a blank guarantee form, which Joyner overlaid with a Harris letterhead. Joyner photocopied the composite, filled it out to make it appear that Harris had issued the guarantee in the amount of $1 million, and sent it to Feldman. Feldman then opened two accounts for the partnership and began selling puts. The accounts, in the name of Western Investment Company, did not reflect Feldman's financial interest.

In August 1977, Joyner opened a checking account for Western Investment at a bank in Chicago. Joyner, his wife and Feldman's wife were authorized to write checks on the account. Proceeds from the partnership's options trading were deposited in this account and expenses of the partnership were paid from the account.

In September 1977, Merrill Lynch required separate guarantees for each transaction rather than simply a blanket guarantee. Joyner used the same method he employed for the blanket guarantee to produce the first few separate guarantees, but Feldman suggested Joyner produce more profes-

---

* The Honorable Edward R. Neaher, Senior District Judge for the Eastern District of New York, sitting by designation.

sional looking letters. Joyner therefore had a professional print guarantee letters purporting to come from an Albert Cooke, vice president of "HTS Options." The address and phone number printed on the letters were actually those of an answering service, which Joyner had employed to answer calls and receive mail. These actions were prompted by Feldman's concern that internal auditors from Merrill Lynch might check into Western Investment's accounts.

Feldman took special care to see that correspondence from Merrill Lynch was addressed to "HTS Options" rather than to "Harris Trust and Savings." Nevertheless, in late February 1978, when he was out of town, a letter was addressed to Harris Trust and Savings and was delivered to that institution rather than to the HTS Options maildrop. Officers at Harris immediately recognized that the enclosed expired guarantee letter did not originate from Harris and began an investigation. Harris officials notified the Merrill Lynch office in New York of the irregularities and arranged to meet with Joyner on February 24, 1978.

On February 22, 1978, Feldman learned from the Hollywood Operations Manager that there was a problem with the Western Investment accounts. Feldman arranged to meet with Joyner at O'Hare airport early on February 24, 1978. There they exchanged checks in order to arrange funds to repay Merrill Lynch the funds it had advanced to Western Investment Company. Feldman expressed his hope that the repayment would put an end to the matter, and assured Joyner that "[n]obody is going to jail." Feldman advised Joyner to say as little as possible to the officials of Harris Trust and Savings and to try to "cover it up."

Later that day, Joyner met with Dillenbach and other Harris officials. Joyner attempted to convince them that the fictitious Mr. Cooke did indeed exist, that the mailing to Harris was just a mistake and that Merrill Lynch in California was taking care of the whole matter. The Harris officials were unconvinced and told Joyner that they intended to notify certain agencies, including the United States government, of the recent events.

Joyner conferred with Feldman again, who advised him to get an attorney and destroy all papers. Joyner, however, did not destroy the partnership and financial documents.

On March 9, 1978, Joyner was interviewed by a Special Agent of the Federal Bureau of Investigation, at which time he admitted to the scheme to deceive Merrill Lynch. In 1980, Joyner entered into a plea agreement with the government whereby he would plead guilty to one count of mail fraud and one count of wire fraud and give truthful testimony at Feldman's trial in exchange for the government's making his cooperation known to the court at sentencing.

At the time the fraudulent scheme was discovered, the value of outstanding options in the Western Investment accounts was $290,000. Merrill Lynch was forced to liquidate the accounts because without sufficient collateral, they were in violation of federal securities laws. At the time of trial, there was still approximately $100,000 owing on the accounts.

Feldman was indicted in November 1981 on nineteen counts of mail fraud and nine counts of wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. At a jury trial which spanned five days, the defendant presented no defense, but attempted to introduce the results of a polygraph examination. The theory of the defense, as expounded in the opening statement and in closing argument, was that the government's evidence showed only that Feldman had an improper financial interest in the Western Investment accounts, but that the government had failed to prove that Feldman knew that the guarantee letters were falsified. On February 22, 1982, the jury found Feldman guilty of all counts. Feldman appeals.

II

Feldman raises several issues on appeal. He first contends that the indictment, the

government's argument and the jury instructions were faulty because they allowed the jury to convict Feldman of mail and wire fraud even if the jurors were convinced only that he had concealed his financial interest in the Western Investment accounts and were not convinced that Feldman knew that the guarantee letters were false. Feldman next contends that the jury was not properly instructed that it must find that Feldman had specific intent to defraud. His third claim is that the court erred in allowing into evidence Joyner's prior consistent statement to the FBI regarding the scheme. Feldman finally contends that the court erred in refusing to admit into evidence the results of the polygraph test he attempted to introduce.

### III

**A. *The Necessity of Finding that Feldman Knew that the Guarantee Letters Were False***

Feldman contends that the indictment was written so that it could be read as charging two schemes, one involving concealment of his financial interest in the Western Investment accounts and one involving the use of falsified guarantee letters. He claims that this, coupled with the government's closing argument characterizing the concealment as fraud on Merrill Lynch and jury instructions to the effect that the government need not prove all of the false representations in the indictment, allowed the jury to convict him of mail and wire fraud based on mere concealment of his financial interest. He contends that this, by itself, would not support a conviction of mail or wire fraud.

It is well established that a scheme which deprives an employer of the honest and faithful services of an employee or the right to have his business conducted in an honest manner can constitute a

scheme to defraud under the mail fraud statute. *See United States v. Bohonus,* 628 F.2d 1167, 1172 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980); *United States v. Bryza,* 522 F.2d 414, 422 (7th Cir.1975), *cert. denied,* 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *United States v. George,* 477 F.2d 508, 513 (7th Cir.), *cert. denied,* 414 U.S. 827, 94 S.Ct. 158, 38 L.Ed.2d 61 (1973). Yet not every breach of duty by an employee works as a criminal fraud, *see id.* at 512, and receipt of secret profits, standing alone, cannot support a mail fraud conviction, *see United States v. Bohonus, supra,* 628 F.2d at 1172. Such activities must be accompanied by a scheme formed with the intent *to defraud. See id.* When an employee breaches a fiduciary duty to disclose information to his employer, that breach of duty can support a mail or wire fraud conviction only if the nondisclosed information was material to the conduct of the employer's business and the nondisclosure could or does result in harm to the employer.[1] *See United States v. Ballard,* 663 F.2d 534, 540–41 (5th Cir. 1981), *modified,* 680 F.2d 352 (1982); *United States v. Bronston,* 658 F.2d 920, 926 (2d Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982). Thus mail fraud indictments or convictions have been upheld where a defendant concealed from his firm's clients his promotion of a competitor's interests, *id.* at 927, where a defendant securities salesman failed to warn his employer that certain accounts were undercapitalized, *United States v. Von Barta,* 635 F.2d 999, 1007 (2d Cir.1980), *cert. denied,* 450 U.S. 998, 101 S.Ct. 1703, 68 L.Ed.2d 199 (1981), and where a defendant employee was receiving kickbacks which might have caused the employer to pay a higher price than necessary for certain items, *United States v. George, supra,* 477 F.2d at 513–14. In contrast, mail fraud convictions were reversed where a defend-

---

1. While most of the cases we cite involve mail rather than wire fraud, the wire and mail fraud provisions are similar and cases construing the mail fraud statute are also applicable to the wire fraud statute. *See United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1188 n. 14 (4th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 729 (1983); *United States v. Giovengo,* 637 F.2d 941, 944 (3d Cir.1980), *cert. denied,* 450 U.S. 1032, 101 S.Ct. 1743, 68 L.Ed.2d 228 (1981).

ant employee was receiving secret profits and his employer was already making the maximum profit allowed by law, *United States v. Ballard, supra,* 663 F.2d at 541, and, in a slightly different context, where the defendant president of a corporation failed to list certain personal loans from the corporation on a proxy statement in connection with the election of an unopposed slate of directors, *United States v. Dixon,* 536 F.2d 1388, 1399–1400 (2d Cir.1976).

■ While Merrill Lynch no doubt has a reason for prohibiting account executives from sharing a financial interest in customers' accounts, the government has produced no evidence that breach of this rule could have harmed Merrill Lynch. On the other hand, the active concealment of such an interest does render an employee's services less than totally honest and faithful. If we were convinced that Feldman's nondisclosure of his interest in Western Investment Company, standing alone, could not support a mail or wire fraud conviction, and if we believed that the jury might have convicted Feldman on this basis alone, the convictions could not stand. When a verdict may have rested on any of several grounds, one of which was improper, the conviction cannot be upheld. *Stromberg v. California,* 283 U.S. 359, 368, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931); *United States v. Baranski,* 484 F.2d 556, 560–61 (7th Cir.1973). However, we are convinced that neither the indictment, the government's argument, nor the jury instructions could have misled the jury into convicting on this basis.

■ Inclusion in the indictment of Feldman's concealment of his interest in the Western Investment accounts was proper, because this was part of an overall scheme to defraud. Not all aspects of a scheme need be illegal if considered separately; rather, it is sufficient that the scheme as a whole involves fraudulent conduct. *United States v. Keane,* 522 F.2d 534, 544 (7th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). While the indictment does detail Feldman's nondisclosure of his interest in the accounts, this is set in the context of describing the particu-

lars of "a scheme or artifice to defraud," the purpose of which was to "induce Merrill Lynch to sell put options for the defendants without the defendants producing the required margin ...." This was the sole purpose described by the indictment, so that the conviction under the indictment must have entailed a finding that Feldman was involved with the falsified guarantee letters. Simply concealing his interest in the accounts would not enable him to trade in options without advancing sufficient collateral. We conclude that the indictment charged a single scheme to defraud, which by its terms could not mislead the jury into convicting solely on finding that Feldman concealed his interest in the accounts.

■ Feldman argues that comments by the government during closing argument could have misled the jury into convicting on improper grounds. While the government did characterize Feldman's concealment of his interest in Western Investment Company as "a fraud on Merrill Lynch," the government also stated at the outset that "[t]he bottom line on this scheme is playing with the house's money .... [Joyner and Feldman] did not put up one thin dime to trade nearly $2 million worth of options." Moreover, although the government referred to the nondisclosure as fraud several times during argument, Feldman made no objection to any of these references until his Motion for a New Trial. In these circumstances, and because the jury was properly instructed on the issue, we find no reversible error in the government's argument.

■ The court instructed the jury that "[i]t is not necessary that the Government prove all of the false pretenses, representations and acts charged in the portion of the indictment describing the scheme. It is essential only that one or more of them be proved which shows the existence of the scheme to defraud." Feldman contends that because several of the false pretenses charged in the indictment dealt only with concealment of his interest in the Western Investment accounts, this instruction allowed the jury to convict him solely on this

basis. This court has already given qualified approval to a similar instruction, even though we suggested that a modification might be appropriate to ensure that the jury does not believe that it *must* find that there was a scheme to defraud if it found *any* of the allegations of the indictment to be proven. *See United States v. Joyce,* 499 F.2d 9, 22–23 (7th Cir.), *cert. denied,* 419 U.S. 1031, 95 S.Ct. 512, 42 L.Ed.2d 306 (1974). In the instant case, any possibility of jury confusion on this point was dispelled by the court's instruction that "[y]ou may only convict the defendant of the scheme charged in the indictment. Should you find that the defendant violated the practices and procedures of Merrill Lynch, Pierce, Fenner & Smith, this alone is not sufficient to convict the defendant of the scheme charged in the indictment." Evaluating the jury instructions as a whole, *United States v. Johnson,* 605 F.2d 1025, 1027 (7th Cir. 1979) (*en banc*), *cert. denied,* 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980), we find that the jury could not have been misled into convicting Feldman solely for his non-disclosure of a financial interest in a customer's account.

Because we conclude that conviction necessarily rested on a finding that Feldman was involved in falsifying the guarantee letters, we need not decide whether Feldman's nondisclosure of his interest in a customer's account could have independently supported a mail or wire fraud conviction.

### B. *Instructions on Specific Intent*

■ An essential element of a mail or wire fraud violation is specific intent to defraud. *See United States v. Keane,* 522 F.2d 534, 544 (7th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976) (mail fraud); *United States v. Dorfman,* 532 F.Supp. 1118, 1123 (N.D.Ill.1981) (wire fraud). Feldman claims that the jury was not properly instructed that they were required to find this element in order to convict.

Feldman concedes that the jury was informed that "[t]he phrase 'intent to defraud' used in the crimes charged means that the act was done knowingly with the specific purpose to deceive, in order to cause financial loss to another or financial gain to one's self." He contends, however, that although the jury was given a definition of intent to defraud, they were not instructed that they must find that Feldman performed the acts charged with this specific intent.

■ Again, in assessing the propriety of an instruction, we must consider all the instructions as a whole. *See United States v. Johnson, supra,* 605 F.2d at 1027. In the instant case, the court not only defined intent to defraud, but also read the indictment to the jury, which charged that Joyner and Feldman "devised and intended to devise a scheme and artifice to defraud and for obtaining money and property from Merrill Lynch by means of false and fraudulent pretenses, representations and promises . . . ." The court then charged the jury that in order to sustain its burden of proof on the mail fraud counts, the government must prove "that the defendant knowingly and intentionally participated in the scheme to defraud which is described in the indictment." A like charge was given with respect to the wire fraud counts. The court further instructed the jury that "[a] scheme to defraud under the Federal statutes means some plan to procure money or property by means of false pretenses or representations calculated to deceive persons of ordinary prudence." Thus the jury was informed that, in order to convict, the government must prove that Feldman *knowingly and intentionally* participated in a scheme to procure money or property from Merrill Lynch by means of false pretenses or representations that were *calculated to deceive.* While the instructions were less than ideal because the phrase "intent to defraud," although it was defined, did not appear in so many words in the burden of proof instructions, we believe that the instructions, considered as a whole, sufficiently apprised the jury that they could convict Feldman only if they found that he committed the acts charged as part of the scheme to defraud with the specific purpose of defrauding Merrill Lynch.

### C. *Joyner's Prior Consistent Statement*

 As a general rule, in order to be admissible, prior consistent statements must meet both the relevance requirement of Rule 401 of the Federal Rules of Evidence and the hearsay exception requirements of Rule 801. Rule 801(d)(1) provides that a prior statement by a witness is not hearsay if the declarant testifies at trial and is subject to cross-examination concerning the statement, and if the statement is consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive. Even if these requirements are satisfied, a prior consistent statement would be relevant to rebut a charge of recent fabrication only if the statement were made prior to the time the alleged motive to falsify arose. *See United States v. McPartlin,* 595 F.2d 1321, 1351 (7th Cir. 1979), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1980); *United States v. Quinto,* 582 F.2d 224, 232–33 (2d Cir.1978).

In the instant case, the government presented evidence that Joyner had made a statement to FBI agents prior to entering into a plea agreement that was consistent with the testimony he gave at trial. Feldman contends that two requirements for admissibility were lacking, asserting first, that there had been no express or implied charge of recent fabrication, and second, that Joyner had the same motive to fabricate at the time he made the prior statement as he had at trial.

In its opening statement, the government informed the jury that Joyner had pled guilty to two counts of the indictment and agreed to cooperate and testify. During its opening statement, the defense elaborated at considerable length on the "deal" Joyner had made with the prosecutors. In its direct examination of Joyner, the government elicited the provisions of the plea agreement. During cross-examination, the defense questioned Joyner about the role the government would play in the event that any state licensing agency should bring a disciplinary action against him. At a side bar conference at which the government

was seeking a ruling on the admissibility of the prior consistent statement, the court repeatedly asked the defense if it intended to argue that the plea agreement was a motivation to fabricate. The court pursued the issue for ten pages of trial transcript, receiving only noncommital responses. Finally, after a recess, defense counsel stated that he intended to talk about the plea agreement during closing argument, but that he did not intend to argue that it was a motivation for recent fabrication. However, since the defense could offer no other inference that it intended to draw from the plea agreement, the court permitted the introduction of the prior consistent statement. During closing argument, the defense detailed the advantages Joyner was to receive as a result of the plea agreement, concluding "as long as he convinces you he is telling the truth, his plea bargain is intact. Don't change your story now, pal."

 While the government was the first to broach the issue of the plea agreement, we agree with the district court that Feldman's use of the plea agreement was to impliedly charge that it motivated Joyner to fabricate his trial testimony. That requirement of Fed.R.Evid. 801(d)(1) is therefore satisfied.

 Feldman argues that Joyner had exactly the same motivation to lie to the FBI in 1978 as he did to lie at trial in 1980, *i.e.* to receive favorable treatment in exchange for implicating Feldman. In this case, there is no evidence that such a motivation did or could have existed in 1978. There is no indication that Joyner had any reason to expect lenient treatment in exchange for implicating Feldman at that time. The statement made to the FBI prior to entering into a plea agreement was therefore relevant to rebut inferences of recent fabrication motivated by the agreement. *See United States v. LeBlanc,* 612 F.2d 1012, 1017 (6th Cir.1980), *cert. denied,* 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60 (1980); *Twitty v. Smith,* 614 F.2d 325, 331 (2d Cir.1979); *United States v. DeLaMotte,* 434 F.2d 289, 293 (2d Cir.1970), *cert. denied,*

401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 825 (1971).

### D. *The Polygraph Evidence*

Four days before his trial began, Feldman submitted to a polygraph examination, the results of which, Feldman argues, should have been admitted at trial. According to the examiner, Feldman was answering truthfully when he denied that he knowingly participated in a scheme to defraud Merrill Lynch, that he participated in forging the guarantee letters, and that he knew that Albert Cooke did not exist. The government was not notified of the examination until after it had been conducted. The district court refused to admit into evidence the results of the examination.

"[T]he rule in the Seventh Circuit is clear: the exclusion of [polygraph] evidence is within the sound discretion of the trial judge. Only abuse of discretion would render the exclusion erroneous." *United States v. Rumell,* 642 F.2d 213, 215 (7th Cir.1981) (citations omitted). Feldman's reliance on *McMorris v. Israel,* 643 F.2d 458 (7th Cir.1981), *cert. denied,* 455 U.S. 967, 102 S.Ct. 1479, 71 L.Ed.2d 684 (1982), in assigning error is misplaced. In that case, we found that in the circumstances of that particular criminal trial, the state prosecutor's unrestricted veto over the use of polygraph evidence was constitutionally infirm. *Id.* at 466. *McMorris* dealt with the power of the prosecutor, an adversary, to unilaterally exclude polygraph evidence. "*McMorris,* however, did not impinge upon the district court's discretion to admit polygraph evidence." *United States v. Lupo,* 652 F.2d 723, 729 (7th Cir.1981), *cert. denied,* 457 U.S. 1135, 102 S.Ct. 2964, 73 L.Ed.2d 1353 (1982).

In the instant case, we find no abuse of discretion in the district court's refusal to admit the polygraph evidence, especially in view of the eleventh hour, secret nature of the examination. "[T]here is reason to believe that tests such as the one conducted here, which are performed at the request of the examinee without advance notice to the Government, are partic-

ularly unreliable since the examinee knows that if he 'fails' the test his counsel will not submit the results to the Government, and therefore is under less stress." *United States v. Dorfman, supra,* 532 F.Supp. at 1136 (citations omitted).

### IV

For the reasons above, Feldman's convictions of mail and wire fraud are affirmed.