**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Philip Matthew DOYLE,**
**Defendant-Appellant.**

**No. 85–1134.**

United States Court of Appeals,
Seventh Circuit.

Argued June 14, 1985.

Decided Aug. 20, 1985.

Geraldine R. Fehst, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

· James J. Flood, Park Ridge, Ill., for defendant-appellant.

Before BAUER and WOOD, Circuit Judges, and GRANT, Senior District Judge.*

BAUER, Circuit Judge.

On November 7, 1984, after an eight day jury trial in the Northern District of Illinois, defendant Philip Matthew Doyle was convicted on three counts of conspiring to bomb a Chicago restaurant in violation of 18 U.S.C. § 844(i) (Count I), bombing the restaurant in violation of 18 U.S.C. § 844(i) (Count II), and knowingly possessing an unregistered firearm in violation of 26 U.S.C. § 5861(d) (Count III). On appeal defendant argues that the trial court erred in denying the defendant's motion in limine regarding his prior convictions and in admitting into evidence certain inculpatory out-of-court statements against the defendant. The defendant also argues that he was prejudiced by the prosecutor's closing argument, which allegedly referred to facts not in evidence. Finally, defendant argues that the evidence was insufficient to support his conviction. We reject all the defendant's claims of error and affirm his conviction on all three counts.

I

On April 9, 1983 at approximately noon a bomb exploded in the kitchen area of the First National Frank, a fast-food restaurant located at 333 East Cermak Street, Chicago. Firefighters from the Chicago Fire Department arrived on the scene soon after the explosion and climbed onto the roof of the single story restaurant. There they found a gaping hole with sheet metal torn apart and tarpaper scattered everywhere. As fireman Cales picked up a plastic bag containing the emblem "Epton for Mayor," cylinder shaped items slid from

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

the bag causing a second loud explosion and a cloud of smoke. The items were later determined to be two high velocity improvised explosive devices. Forty to fifty people were in the restaurant at the time of the first explosion and were thereafter evacuated; none of these diners were injured. Fireman Cales lost his hand, however, and two other firemen suffered ear and back injuries because of the second explosion. The owner of First National Frank, Sydney Kramer, was forced to close the restaurant for ten days as a result of the bombing.

It is largely through the testimony of four co-conspirators named in Doyle's indictment that the story of this episode of the Chicago hot dog wars took shape at trial. The cast of characters includes Michael Skidmore, who was granted immunity as to the restaurant bombing in return for his testimony; his wife, Rose Skidmore, who was also granted immunity; and Fred Jennings, also known as Fred Olsen, who, in return for his testimony, entered into a plea agreement which provided protection for his wife, Barbara Olsen, a named co-conspirator, and his son, Joe Jennings. After the bombing, the Skidmores and the Jennings fled to Florida and then Arizona in an attempt to escape the FBI investigation of the bombing. Eventually, however, they agreed to cooperate with the government and it is the facts as elicited through their testimony which we now relate.

Told in its simplest fashion, the story of the bombing begins in the fall of 1982 when Joe Jennings, employed at that time in a Chicago restaurant, called his father, Fred Jennings, in Florida to ask him if he knew anyone who could bomb a hot dog stand in Chicago. Joe said that a man named David wanted the job done. Testimony later revealed that Joe worked at a rival hot dog restaurant, whose owner's first name was David. Fred responded that he did not know anyone, but Joe persisted and Fred agreed to look around. Although the testimony is disputed as to the first meeting of Michael Skidmore and Fred Jennings regarding the bombing, it is not disputed that after Joe's call Fred and

Michael met in Florida and agreed that Skidmore would do the job and be paid $5,000. They also agreed that Joe would try to get $10,000 for the job and keep the extra $5,000 for himself.

With this plan in mind, Skidmore, accompanied by his wife, Rose, and Barbara Olsen, went to Chicago on February 27, 1983 to survey and photograph the restaurant. After spending two days surveying the restaurant, Skidmore concluded that the job should pay at least $40,000 because the restaurant was much bigger than an ordinary hot dog stand. Both Skidmore and his wife attempted to get more money by calling Fred and Joe Jennings.

Skidmore then sought out Philip Doyle, whom he had known for two years and had met through Jennings. A series of meetings occurred involving the defendant, Skidmore, and his wife. At various times they met at the Skidmore's motel, the defendant's home in Lombard, a restaurant called Noodles, and a bar called The White Stallion. The defendant had asked who would guarantee the $5,000, had admitted he was not an expert in bombings and had said he knew someone named Bill from whom he could get some dynamite. The defendant and Skidmore talked about various methods of bombing the restaurant, but Skidmore testified that at the end of these conversations the defendant had not positively decided to take the job. Skidmore, his wife, and Barbara Olsen then returned to Florida, and reported to Fred Jennings what had transpired in Chicago. Approximately a week after Skidmore's return, Fred Jennings testified that the defendant called him and asked him whether Jennings would guarantee the $5,000. Jennings replied that he would.

In March 1983 the Skidmores made a second trip to Chicago with Fred Jennings. Skidmore testified that at Jennings' urging, he once again contacted Doyle, whom he later met in a restaurant to discuss the bombing. Skidmore described the restaurant to Doyle, told him to attribute the bombing to a political group once it was

done, and to call Fred Jennings for the money after the bombing. Skidmore testified that Doyle agreed to do the job and Rose Skidmore testified that Skidmore had told her after lunch that Doyle had agreed to do the job. On March 29, 1983, Rose Skidmore returned to Florida. Michael Skidmore and Fred Jennings returned to Florida on April 5, 1983. On April 9, 1983 a bomb exploded at noon at the First National Frank.

Fred Jennings testified that a few days after the bombing Doyle called him to discuss the bombing and ask about the payment for the job. Jennings called his son, with whom he had previously discussed the bombing, and Joe told his father that the payment would only be $2,500 because the job had not been done properly. On the day of the bombing over a series of phone calls Skidmore and Jennings had discussed the fact that the bombing had occurred at noon and not midnight and that people had been injured. Doyle's name was not mentioned in these calls. Fred Jennings testified to a second conversation in which Doyle confirmed that he had received the money.

Skidmore testified that on May 27, 1983, in a telephone conversation, Chuck Kazamer told Skidmore that Skidmore and Jennings were wanted in an FBI investigation of the bombing. Skidmore also called Danny Baranowski, who told Skidmore that he should not return home because of the FBI investigation. Skidmore then met with Fred Jennings and Barbara Olsen in Jacksonville, Florida, and commenced to travel with them in an attempt to avoid the FBI. Rose Skidmore eventually joined her husband and the Jennings and traveled with them for eight months. During this time from May 28, 1983 to June 2, 1983 they placed five calls to the defendant from various locations in Florida.

Special Agent Scott Jennings, an FBI agent assigned to the investigation of the First National Frank bombing, testified at trial that on November 22, 1983, he interviewed the defendant. Defendant at first told Special Agent Jennings that he had not seen the Skidmores and Jennings in close to two years. When confronted with business records of telephone calls from Skidmore's motel room to defendant's residence, defendant admitted that he had in fact seen the Skidmores and Barbara Olsen during March 1983.

On January 25, 1984, Special Agent Jennings testified that a search warrant was executed at defendant's home to find evidence relating to the bombing of the restaurant. The only evidence found at the defendant's Lombard home was a pair of yellow-handled wire strippers which, when scrapings from the sides of the item were examined by the FBI laboratory and compared with wires found at the bombing scene, had a similar color and texture as the insulation material on the wire that was used in the bombing. The FBI expert testified that there are millions of feet of such wire present in the Chicago area. The FBI's explosives expert testified that there was no presence of the residue commonly associated with dynamite. The expert testified that the tool marks present on wire from the scene did not match any tools recovered from Doyle's home. Finally, wire taken from Doyle's home was not at all similar to that recovered from the crime scene.

The Skidmores began to cooperate with the government before the Jennings did, and, as part of his cooperation, Michael Skidmore placed a telephone call on April 2, 1984, to Fred Jennings, and, unbeknownst to Jennings, tape recorded the phone call. During the conversation, Jennings and Skidmore agreed that if they'd done the bombing themselves, instead of Doyle, no one would have been hurt. As a direct result of the April 2 conversation, Jennings was arrested, indicted and pled guilty to conspiring to bomb the restaurant, aiding and abetting the bombing of the restaurant, and obstruction of justice.

After Doyle's trial, the jury returned a verdict of guilty on all three counts. The trial court thereupon sentenced the defendant to 20 years incarceration on Count Two, and ten years incarceration on Count Three, to run concurrently with Count One.

Defendant's sentence on Count One, was suspended and replaced with 5 years probation. Doyle's motion to appeal in forma pauperis was granted, and his notice of appeal to this court was docketed January 28, 1985.

## II

The first issue for review presented by the defendant concerns the trial court's denial of defendant's motion in limine regarding his prior convictions. The defendant was convicted in 1964 of burglary and attempted murder in state court, and of a federal weapons violation in federal court. The defendant was released from custody on the federal charge in 1977. Prior to trial the defendant moved in limine to prevent the prosecution from cross-examining him concerning his prior convictions. The court denied the motion finding that the prosecution's proposed use was proper under Federal Rule of Evidence 609(a)[1] and not outweighed by unfair prejudice to the defendant. The defendant argues that because of this ruling he did not testify at trial, fearing the prejudicial results his two felony convictions would have on the jury. The defendant argues, therefore, that the court abused its discretion by failing to take into account the importance of the defendant's testimony when permitting the use of the prior convictions. *See United States v. Mahone*, 537 F.2d 922, 929 (7th Cir.1976); *Luck v. United States*, 348 F.2d 763, 768 (D.C.Cir.1965).

The defendant's argument flies in the face of the Supreme Court's most recent decision on the use of Federal Rule of Evidence 609(a), and therefore must fail. *Luce v. United States*, — U.S. —, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). In *Luce*, the Court held that "to raise and preserve a claim of improper impeachment with a prior conviction, a defendant must testify." *Luce*, 105 S.Ct. at 465. During his trial Luce moved for a ruling to preclude the Government from using a 1974 state conviction to impeach him if he testified. The petitioner did not promise to testify if the motion were granted nor did he make a proffer of what the testimony would be. The district court ruled that the prior conviction fell within the category of permissible impeachment evidence under Federal Rule of Evidence 609(a). Petitioner did not testify and was found guilty by the jury. The United States Court of Appeals for the Sixth Circuit affirmed, as did the Supreme Court.

The Supreme Court reasoned that had the defendant testified and been subject to impeachment by prior conviction, the trial court's decision to admit the prior conviction would have been reviewable on appeal. The Court stated, however, that when the defendant does not testify, any possible harm flowing from the impeachment ruling is "wholly speculative." *Luce*, 105 S.Ct. at 463. The Court reasoned that

[a] reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context. This is particularly true under Rule 609(a)(1), which directs the court to weigh the probative value of a prior conviction against

---

1. Rule 609(a) provides:

(a) *General rule.* For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment.

(b) *Time limit.* Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness for the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence.

the prejudicial effect to the defendant. To perform this balancing, the court must know the precise nature of the defendant's testimony, which is unknownable when, as here, the defendant does not testify.

*Luce*, 105 S.Ct. at 463 (footnotes omitted).

■ The factual situation in this case exactly parallels the facts in *Luce*. If the defendant had testified, a fully reviewable record would have been created. We will not now speculate as to what effect the admission of the prior convictions would have had on the defendant's credibility. The defendant therefore has not preserved his claim of improper impeachment for appeal.

### III

The defendant's second claim of error is that the district court improperly admitted into evidence certain out-of-court statements inculpatory of the defendant. The defendant argues that certain statements of co-conspirators were erroneously admitted because they were made neither during the course of the conspiracy, nor in furtherance of the conspiracy. The specific testimony about which defendant complains is the following:

Skidmore (testifying about his phone conversation with Jennings):

And he (Jennings) said, "I just got a call from Joe" which is his son—and he said, "Doyle fucked the job up."

I said, "What happened?"

He said, "He had the timers set wrong some way or another and the building blew up 24 hours at the wrong time. It was supposed to go at midnight and it went at noon." (Tr. 545).

The defendant claims that the error in the admission of this conversation was compounded when Rose Skidmore testified, regarding the same phone conversation her husband had with Jennings, that Jennings said: "Doyle did the job and he screwed it up and there were several people hurt." (Tr. 789).

Defendant further claims that the admission of Jennings' testimony about his phone conversation with his son Joe after the bombing aggravated the error. Jennings specifically testified that:

He (Joe) said that the restaurant had been blown up and that a bunch of firemen were hurt and a bunch of people were hurt. That's why he was very upset. That's what he told me. (Tr. 691).

■ A statement is not hearsay if the statement is offered against a party and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." FED.R.EVID. 801(d)(2)(E). A statement is admissible against a co-conspirator where "it is more likely than not that the declarant and the defendant were members of a conspiracy when the ... statement was made and that the statement was in furtherance of the conspiracy." *United States v. Santiago*, 582 F.2d 1128, 1134 (7th Cir.1978) (*quoting United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977)). The district court stated in this case that it would find that the statements noted above were made during the course of the conspiracy, "based on the representations of the government that the evidence that the government is to present will show that the conspiracy was not only to bomb the building but also to be paid."

Contrary to the defendant's assertions, an arson conspiracy does not necessarily end once the fire has been set. In *United States v. Xheka*, 704 F.2d 974 (7th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983), for example, this court held that the goal of the charged conspiracy to destroy a building was both to burn the restaurant and to collect the insurance money for the restaurant. In *Xheka*, the defendants argued that the conspiracy ended once the restaurant had been burned, so that conversations made after the fire were inadmissible under Rule 801(d)(2)(E). The court reasoned: "[h]ad defendants conspired to destroy [the restaurant] simply for the joy of destruction their arguments would have merit, but that was not the case." *Xheka*, 704 F.2d at 985.

The court reviewed the evidence finding that the government had shown the central importance to the conspiracy of obtaining the insurance money and concluded that "[t]he conspiracy continues until the defendants obtain the insurance money or abandon their quest." *Id.* at 986.

The conspirators in this case, while not seeking insurance money, had objectives similar to those of the *Xheka* conspirators. Certainly, the goal of the defendant was to bomb the restaurant and be paid for it. The evidence produced at trial showed that the method used to achieve the bombing and the cost of the "job" were frequently discussed amongst the Skidmores and Jennings, and, once he was hired, the defendant. Originally Michael Skidmore had considered doing the job, but upon surveying the restaurant thought the job was worth $40,000. Fred Jennings testified that the bombing was originally to pay $10,000: $5,000 to defendant and $5,000 to Joe Jennings. The defendant, Fred Jennings testified, was sufficiently concerned about the price of the job and the security of his payment to call Jennings in Florida.

The conversations after the bombing were significant because they determined the price the defendant was actually paid. Jennings testified that because the bomb blew up in the middle of the day and injured firemen, and because the restaurant was not totally destroyed, the defendant was ultimately paid only $2,500. The conversations about which the defendant complains, therefore, were properly admitted, as in the course of and in furtherance of the conspiracy as understood by this court in *Xheka*. They related to how the defendant botched the job which determined how much he was ultimately paid for his role in the conspiracy. The challenged conversations were properly admitted as updates on the status of the conspiracy and how that status affected the final amount of payment, which would end the conspiracy.

### IV

The defendant also contends that the district court erroneously admitted the following tape-recorded telephone conversation between Fred Jennings and Mike Skidmore.

"MICHAEL SKIDMORE: I was thinking if me and you would have went up there and did that damn job ourself.

FRED OLSEN (a/k/a Jennings): (Laughs).

MICHAEL SKIDMORE: Or if I'd a went ahead and did it myself and the hell with Phil Doyle, nobody would have got hurt, we wouldn't have had any problems.

FRED OLSEN: Not a bit.

MICHAEL SKIDMORE: You know.

FRED OLSEN: Yeah, don't talk on the phone.

The government sought to admit the above conversation after the defense counsel's cross-examination of Fred Jennings, in which the defense had implied that Jennings was motivated to falsely accuse Doyle by a desire to avoid culpability for himself and his wife and son.

Rule 801(d)(1)(B) of the Federal Rules of Evidence provides that a prior consistent statement is not hearsay if the declarant testifies, is subject to cross-examination concerning the statement and the statement is "offered to rebut an express or implied charge against him or recent fabrication." FED.R.EVID. 801(d)(1)(B). The statement may be excluded even though relevant "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time or needless presentation of cumulative evidence." FED.R.EVID. 403.

The defendant argues that at the time of the recorded conversation Jennings was well aware that the FBI investigation had already focused upon him and his family since he had been called before the grand jury in November 1983 and his wife had already been immunized before the grand jury. The defendant argues that Jennings' motivation to falsely accuse Doyle existed

at the time the statement was made, and that it therefore did not rebut a charge of recent fabrication or improper motive, and should not have been admitted.

The trial court ruled that our decision in *United States v. Feldman*, 711 F.2d 758 (7th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983), was the governing principle under which the admissibility of the statement must be determined. In *Feldman*, the government presented evidence that a co-conspirator had made a statement to FBI agents prior to entering into a plea agreement which was consistent with the testimony he gave at trial. The defendant argued that the co-conspirator had exactly the same motivation to lie to the FBI in 1978 as he did at the trial in 1980 because both statements were motivated by a desire to receive favorable treatment in exchange for implicating the defendant. The court reasoned, however, that there was no evidence of such a motivation in 1978, and therefore held that "[t]he statement made to the FBI prior to entering into a plea agreement was therefore relevant to rebut inferences of recent fabrication motivated by the agreement." *United States v. Feldman*, 711 F.2d at 766. In *United States v. Grunewald*, 233 F.2d 556 (2d Cir.1956), the Second Circuit confronted the same situation: a plea agreement was offered by the defense as a motive to lie and then a prior consistent statement was offered by the government, prompting the defense to suggest an even earlier motive to lie. The Second Circuit found this contention of a earlier motive to lie was "appropriate enough in summation to the jury but insufficient to form a basis for rejection of the testimony as a matter of law." *Grunewald*, 233 F.2d at 566.

The district court found *Feldman* to be "very close" to the instant case, and we agree. The district court reasoned that:

there is no evidence that I know of that supports the idea that sometime prior to this April '84 conversation Skidmore and Olsen had gotten together to work out a deal in which they jointly were going to

dump it off on Doyle.... As far as I can see, there was absolutely no motivation for Fred Olsen to lie to Skidmore in what he considered to be a private telephone conversation between two people who were being chased by the government.

The district court was therefore correct to compare the instant case to *Feldman*. In the instant case, the defense presented no evidence of its claim that Fred Jennings had a motive to lie to his co-conspirator about what the defendant's role in the bombing was. All the evidence suggests that Jennings was not lying. Jennings could not have lied on the stand about conversations with the defendant about the bombing because Skidmore also had knowledge about these conversations. Jennings' testimony that defendant did the bombing is also consistent with what he told Skidmore the day after the bombing, which was long before he knew the FBI was after him. The trial court was therefore correct in finding that the probative value of the April 2, 1984 phone conversation outweighed any possible prejudice to the defendant. The jury was entitled to assess the defendant's cross-examination of Jennings regarding Jennings' plea agreement in light of the prior consistent statement.

### V

The defendant argues that he was prejudiced by the prosecutor's closing argument because the prosecutor allegedly referred to facts not in evidence. The particular statements at issue were:

Now let me stop with Fred Olsen. Fred Olsen, who Mr. Bredemann would have you believe is coming up with this one unified lie with the Skidmores to frame Phil Doyle—Olsen got prosecuted in this case. And why did he get prosecuted? He got prosecuted because Mike Skidmore and Rose Skidmore told us about his involvement. That man has no reason to

MR. BREDEMANN: Objection.

THE COURT: Objection overruled. Counsel may proceed.

MR. SANDERS: There is no logical, reasonable motive, using your common sense, why Fred Olsen would get together with Mike Skidmore and make up a story about Phil Doyle.

If Fred Olsen was going to make up a story about anybody, to lie from the witness stand to convince you that somebody did the bombing who really didn't, who is he going to name? He's going to name Mike Skidmore, the guy who caused him to spend ten years of his life in jail. [S.R. 76–77]

The defendant essentially argues that the prosecutor argued that Jennings' accusations against Doyle are to be believed because Jennings had a motive to falsely accuse Skidmore—not Doyle—because it was Skidmore's conduct and testimony that resulted in Jennings' arrest and subsequent plea agreement. The defendant asserts, however, that the fact that Skidmore's conduct led to Jennings' arrest was not in evidence.

█ It is a fundamental rule that closing arguments are limited to facts in evidence. *United States v. Trapnell*, 638 F.2d 1016, 1025 (7th Cir.1980). Counsel may also make arguments, however, "reasonably inferred from the evidence presented." *United States v. Vargas*, 583 F.2d 380, 385 (7th Cir.1978) (*citing United States v. Thomas*, 345 F.2d 431, 433 (7th Cir.1965)). Inferences, however must be "fair comment on the evidence," and not "akin to the presentation of wholly new evidence." *Vargas*, 583 F.2d at 385.

█ We think that the prosecutor's arguments were fair comment in the instant case. While the fact of Skidmore's causation of Jennings' arrest was not explicitly stated in the trial record, we think it was sufficiently inferable from the evidence presented to support the prosecutor's closing arguments. At trial, the jury was advised by a stipulation that it would hear a part of a tape recording of a conversation between Skidmore and Jennings on April 2, 1984, at which time Skidmore had been cooperating with the government while Jennings was not aware of his cooperation or the recording of the conversation. The jury knew that the conversation occurred after Jennings was called to the grand jury but before he was arrested, indicted or had any plea agreement with the government. The jury then heard Skidmore and Jennings agree that if they had done the bombing themselves no one would have been hurt. The government argues that the chronology of these events leads to the logical conclusion that Jennings had Skidmore to blame for the charges that followed soon thereafter, and we agree.

The government also argues that Jennings' derogatory remarks against Skidmore during Jennings' testimony show that Jennings knew that it was Skidmore's cooperation with the government that led to his arrest and indictment. During his testimony, Jennings referred to Skidmore as "that other guy" rather than by name. When asked how long he had known Skidmore, Jennings replied "it has been too long." The jury was entitled to conclude from these remarks that Jennings knew what Skidmore had done to him. The prosecutor's comments in closing argument were fair and logical inferences from the record. Because we have determined the comments were not prejudicial, it is not necessary to consider whether the alleged error was harmless. *See Trapnell*, 638 F.2d at 1025–26; *Vargas*, 583 F.2d at 387.

## VI

█ Finally, the defendant argues that the evidence was insufficient to sustain the defendant's convictions for conspiracy and the underlying substantive offenses. We note first that "the verdict of the jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The defendant argues principally that the evidence was insufficient because it consisted mostly of the testimony of accomplices who had motivation to falsely accuse the defendant and because little physical evidence connects the defendant to the bombing. The

defendant points the finger at Skidmore and Jennings and even at the bit players, Kazamer and Baranowski, as possible candidates for the role of the bomber. We think, however, that upon review of the evidence, which has been recounted enough so as to preclude further reiteration here, it was not unreasonable for the jury to conclude that the defendant conspired to bomb First National Frank, that he performed the actual bombing and that he knowingly possessed the two destructive devices used in the bombing which were not registered to him. Viewing all this evidence in the light most favorable to the government, there can be no doubt that there was sufficient evidence to support the jury's decision.

For all the reasons stated above, therefore, the conviction of the defendant on all three counts is affirmed.

AFFIRMED.