Donald STUMPF, Appellant,

v.

STATE of Alaska, Appellee.

No. A–423.

Court of Appeals of Alaska.

Jan. 22, 1988.

884

Susan Orlansky, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

COATS, Judge.

On December 29, 1982, Hui Yi was shot and killed. Two men escaped in a white and yellow International Scout with Colorado license plates. On February 18, 1983,

Timothy E. Arnold and Donald Stumpf were indicted for the murder. Arnold and Stumpf were tried separately. A jury convicted Stumpf of first-degree murder.

Hui Yi had immigrated from Korea. In mid–1981, Yi bought an interest in an Anchorage tailor shop from D.S. and T.S. At trial, the state claimed that tensions developed when D.S. began demanding $10,000 above the agreed-upon price for the tailor shop. Because of these financial disagreements, D.S. and T.S. hired Stumpf to kill Yi. Apparently Stumpf was friendly with T.S. and dealt drugs with him. The state argued that Stumpf and Arnold carried out the contract murder. Stumpf was sentenced to ninety-nine years in prison. Stumpf appeals his conviction to this court. We affirm.

## GRAND JURY ISSUES

At trial, Stumpf moved to dismiss. He claimed that hearsay from Timothy Arnold and D.S. was improperly presented by Arvard Holts and Donald Smith. Stumpf also claimed that Tyrone Monteiro perjured himself before the grand jury. Superior Court Judge J. Justin Ripley denied these motions. On appeal, Stumpf argues the trial court erred in denying his motions to dismiss and adds that Ann Stockard also testified falsely to the grand jury.

■ At the grand jury proceedings, Arvard Holts testified that Arnold had admitted that he and Stumpf killed Yi. The Alaska Supreme Court has held that a codefendant's hearsay statements are admissible before the grand jury. *Preston v. State*, 615 P.2d 594, 598–99 (Alaska 1980); *Galauska v. State*, 527 P.2d 459, 465 (Alaska 1974), *modified on other grounds*, 532 P.2d 1017 (Alaska 1975). In attempting to present a codefendant's hearsay statements, the prosecution may generally presume that the codefendant will invoke fifth amendment rights. *Gutierrez v. State*, 673 P.2d 287, 289 (Alaska App.1983). In arguing that Arnold's statement was improperly admitted before the grand jury, Stumpf asks this court to find that *Galauska* was wrongly decided. We believe that *Galauska* is controlling. We accordingly find no error.

■ Donald Smith told the grand jury that D.S. felt that Yi was causing him a lot of trouble. Smith testified that D.S. told him that some day he might have "$50,000 to have [Yi] taken care of." D.S. allegedly said that Smith could get away with the murder by claiming insanity, while a Korean could not make the same defense for fear of deportation. Smith refused the apparent offer. When Smith confronted D.S. after the murder, Smith was allegedly told that D.S. would not be suspected because D.S. had been in Kotzebue at the time.

Stumpf contends that these statements are inadmissible hearsay. The state argues that D.S.'s statements were offered only to prove D.S.'s desire and willingness to kill Yi, and were thus admissible either as verbal acts or under the state of mind exception to the hearsay rule. *See* A.R.E. 803(3). We conclude that D.S.'s statements were admissible to show his desire and willingness to kill Yi. We note that D.S.'s statements did not directly implicate Stumpf. Although it is questionable whether D.S.'s final statement about having been in Kotzebue at the time of the murder was admissible, it does not appear to us that this statement would have had any material effect on the grand jury's deliberations.

■ Alternatively, Stumpf argues that the prosecutor was required to resubmit the charges to the grand jury because two witnesses perjured themselves before that panel, and because the prosecutor learned of one witness's perjury before Stumpf's trial began. Tyrone Monteiro testified before the grand jury on February 17, 1983. At issue is Monteiro's statement that, when Stumpf and Arnold left Arnold's apartment on the night of the murder, Arnold told him that he and Stumpf were going to "do a job" on Government Hill. Monteiro told the grand jury this meant that they were going to remodel some bathrooms.

The police subsequently received information that Monteiro had lied to the grand jury and that he had helped Arnold dispose of the murder weapon. When the police

confronted Monteiro, about five days after his grand jury appearance, he admitted his lies and his part in helping Arnold retrieve the pistol. He later showed the police where the gun was recovered. At trial, Monteiro admitted lying to the grand jury. He said he had done it to protect himself and his friends, Stumpf and Arnold.

Monteiro was indicted on March 2, 1983 for perjury and hindering prosecution in the first degree. A.S. 11.56.200; A.S. 11.-56.770. He then entered into an agreement with the state. He pled guilty to the hindering prosecution charge and agreed to testify at Stumpf's trial, in exchange for the state's dropping the perjury counts. Monteiro's trial testimony was highly incriminating to Stumpf.

Stumpf argues that the prosecution was required to reconvene the grand jury and inform it of Monteiro's perjury. Stumpf cites *United States v. Basurto*, 497 F.2d 781 (9th Cir.1974). In *Basurto*, the court held that due process is violated if a defendant stands trial on an indictment which the government learned, before trial, was based on evidence which is both perjured and material. *Id.* at 785. The *Basurto* decision, however, has been significantly weakened by subsequent decisions in the Ninth Circuit. These later cases question the validity of *Basurto* and narrow its holding. *See United States v. Bracy*, 566 F.2d 649 (9th Cir.1977), *cert. denied*, 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978); *United States v. Bowers*, 534 F.2d 186 (9th Cir.), *cert. denied*, 429 U.S. 942, 97 S.Ct. 360, 50 L.Ed.2d 311 (1976).

■ In the instant case, Monteiro's trial testimony was far more incriminating to Stumpf than the statements he initially made to the grand jury. Monteiro's earlier testimony can be explained as an attempt to protect himself and his friends. There is no reason to suspect that presenting Monteiro's later story to the grand jury would have had any effect on whether or not Stumpf was indicted. We accordingly hold that the trial court did not err in refusing to dismiss the indictment on this ground. There was also no reason to suspect that the state had engaged in any misconduct in presenting Monteiro's first statements to the grand jury. We therefore find that the trial court did not err in refusing to grant a hearing to further explore this issue.

■ Stumpf also alleges that Ann Stockard perjured herself before the grand jury. He argues that the indictment should have been dismissed on this ground. It does not appear, however, that this issue was raised in the trial court. It also does not appear that Ann Stockard's later statements would have been material to the grand jury's decision to indict. We find no error.

## CO–CONSPIRATOR STATEMENTS

The trial court allowed several witnesses to testify about statements that Arnold allegedly made to them. Stumpf objected to the statements, claiming they were hearsay and that admitting them violated his right of confrontation. The trial court ruled, before trial, that Arnold's statements would be admissible as statements of a co-conspirator in the course of and in furtherance of the conspiracy.

■ Alaska Evidence Rule 801(d) provides, in pertinent part:

A statement is not hearsay if ... the statement is offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

The state must establish several foundational facts by a preponderance of the evidence in order to have such statements admitted at trial. The state must show that there was an agreement of intent to carry out a criminal plan; that the statement was made during the conspiracy's existence; and that the statement was made in furtherance of the conspiracy. *Hawley v. State*, 614 P.2d 1349, 1354–55 (Alaska 1980); *Adams v. State*, 706 P.2d 1183, 1187 n. 3 (Alaska App.1985).

Judge Ripley issued the following findings of fact on this matter:

(1) that a conspiracy existed between the defendant, Donald Stumpf and Timothy Arnold, to kill Yi for money;

(2) that the conspiracy existed from approximately mid–December 1982 until at least through December 31, 1982; and

(3) that the statements made by Timothy Arnold to Tyrone Monteiro and [Paula] Renee Hailey as were testified to in the trial of this matter were made in the furtherance of said conspiracy.

The testimony at issue is as follows:

(a) Sherry Schroeder described a phone call she received from Arnold on December 30:

Archie [Arnold] called me sometime in the afternoon and was very demanding. He wanted to know where Cowboy [Stumpf] was. And I had told him that Cowboy wasn't back yet. And he started jumping on me because he said that Cowboy owed him some money and he wanted to get his apartment.

(b) Monteiro testified that he and Arnold had been walking past Yi's tailor shop about two weeks before the killing. Arnold told him that someone in Kotzebue had given Stumpf a contract to kill the Korean owner of the shop for $5,000, that Arnold was to get half that amount, and that Stumpf and Arnold had someone following the intended victim to learn his routine.

(c) Monteiro testified about statements Arnold allegedly made to him when Arnold returned to his apartment in the early morning hours of December 30. Arnold purportedly told Monteiro that he had been with Stumpf that night when Stumpf shot a Korean on Government Hill. He described the shooting and said that they would get paid for the shooting. Arnold explained how he had thrown the gun out the vehicle window on the way back and asked Monteiro to help him retrieve the gun.

(d) According to Monteiro, within a day or two of the murder, Arnold came home angry that Stumpf had not paid him, saying he needed the money to get out of town. Further, Monteiro said that he had lied to the grand jury because Arnold had told him that "if [Monteiro] didn't keep [his] mouth shut, [he would] get it shut."

(e) Paula Renee Hailey testified that she heard Arnold and Stumpf talking about money before the killing, and that Arnold had said he was going to use the money to get an apartment. Hailey also testified that she had trimmed Arnold's hair one to two weeks before the murder, and that he had told her at that time that he would need another haircut within a few weeks.

(f) Hailey cut Arnold's hair the afternoon after the murder. When Hailey asked Arnold why he was in such a hurry, he said he had to change his identity because he and Stumpf had killed someone.

(g) According to Hailey, later that same day, Arnold told her, Monteiro, and another person that he would "blow [their] heads off" if they didn't "keep [their] mouths shut."

## A. Were the Statements Made During the Conspiracy's Existence?

Stumpf first argues that even if the state established by a preponderance of the evidence that Arnold and Stumpf did conspire to kill Yi, the state did not meet its burden of showing that they agreed to kill Yi for money. Thus, in Stumpf's view, statements made after the killing itself were made after the conspiracy achieved its aim and terminated. Stumpf's burden on this point is to show that the trial court's finding to the contrary is clearly erroneous. *Troyer v. State*, 614 P.2d 313, 318 (Alaska 1980).

A conspiracy terminates after it achieves its primary goal. Statements made after that time are not admissible under the co-conspirator exception to the hearsay rule, and another conspiracy to conceal the crime will not automatically be inferred from the existence of the initial conspiracy. *Krulewitch v. United States*, 336 U.S. 440, 442–45, 69 S.Ct. 716, 717–19, 93 L.Ed. 790 (1949). Where one of the conspirator's main goals is to receive money, however, the conspiracy does not end until the money is paid. Statements made to further the conspiracy after the central crime is committed, but before payment is received, are admissible. *United States v. Doyle*, 771 F.2d 250, 255–56 (7th Cir.1985).

The state cites several facts, apart from the challenged statements, which it alleges support the trial court's findings. Stumpf told Anthony Andreas, whom he asked to manufacture a silencer, that he was planning to kill someone for large amount of money or drugs. Stumpf and Arnold were together on the night of the killing, and both changed their appearance drastically within hours of the shooting. Several days after the murder, Stumpf went to Kotzebue for a few hours, returned with a large amount of money, and apparently gave Arnold about $1,500 of that amount. A few days earlier, Stumpf had almost no money. About a week after the killing, Stumpf sent Roseann Dietz to the Spenard Lounge, in an unsuccessful attempt to collect money from T.S., which he apparently owed to Stumpf. In January, Ann Stockard asked Stumpf how much he had been paid for the killing, and he indicated that he had received $10,000. Arnold and Stumpf together tried to get Arvard Holts to help them to leave the state after the killing. It appears that there was sufficient evidence to support the trial court's findings on the conspiracy's aim and duration.

## B. Did the Statements Further the Conspiracy's Aims?

Stumpf also argues that several of Arnold's statements were inadmissible because they were not intended to advance the conspiracy's goals. A co-conspirator's simple admission to another person of complicity in the crime, that does not aid the accomplishment of the conspiracy's aims, is not admissible under the co-conspirator exception. *Williamson v. State*, 692 P.2d 965, 969 (Alaska App.1984); *Crump v. State*, 625 P.2d 857, 862–63 (Alaska 1981).

(a) With respect to Arnold's statement to Sherry Schroeder that Stumpf owed him money, Stumpf relies on *United States v. Fielding*, 645 F.2d 719 (9th Cir. 1981). In *Fielding*, the court held that one conspirator's statements made to obtain payments from another conspirator were not admissible because these statements did not advance the common objectives of the conspiracy. *Id.* at 726–28. In response, the state cites *United States v. Ammar*, 714 F.2d 238 (3rd Cir.), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed. 2d 311 (1983). In that case, the court held statements made by one conspirator to another conspirator that they should try to obtain bail money from a third co-conspirator, who still owed them money from the drug sales underlying the conspiracy, were admissible. *Id.* at 252–53.

The underlying rationale of the co-conspirator exception to the hearsay rule is an agency theory. It does not appear to us that Arnold was attempting to advance the conspiracy's central purpose when he asserted that Stumpf owed him money. We conclude that this statement should not have been admitted under the co-conspirator exception.

(b) We next analyze Arnold's statement to Monteiro that Stumpf had a contract to kill someone. The state argues that this statement was an attempt by Arnold to get Monteiro to participate in the conspiracy. The connection between this statement and any attempt by Arnold to enlist Monteiro's aid in the conspiracy appears to us to be tenuous. It appears to us that this statement should not have been admitted as being in furtherance of the conspiracy.

(c) We next turn to Arnold's description of the crime to Monteiro prior to asking Monteiro to help him retrieve the gun. It appears to us that in making these statements, Arnold was clearly trying to get Monteiro to help him conceal evidence of the crime. We conclude that the court did not err in finding that these statements were made in furtherance of the conspiracy.

(d)(1) It does not appear to us that Arnold's assertion to Monteiro that Stumpf owed him money was a statement made in furtherance of the conspiracy.

(d)(2) Arnold's threat to silence Monteiro, if he said anything about the crime, is not a factual assertion and is not hearsay.

(e) Arnold's statement that he would soon want another haircut does not appear to be a statement in furtherance of the conspiracy. It does appear to be admissible, however, as showing Arnold's state of mind. Hailey's other statements, concerning Arnold's and Stumpf's discussion about money and Arnold's plan to use the money for an apartment, were not offered for the truth of the matter asserted and are admissible under the state of mind exception.

(f) Arnold's description of the crime to Hailey, while she was giving him a haircut, can be interpreted as intended by Arnold to have Hailey conceal the crime. This is a close issue, but it appears to us that the trial court could reasonably conclude that these statements were statements in furtherance of the conspiracy.

(g) Arnold's threats against Hailey and Monteiro constitute an attempt to conceal the crime and therefore can be seen as an attempt to further the goals of the conspiracy.

Of the admitted statements that we conclude should not have been admitted, the only one that has any possibility of being material was the statement made by Arnold to Monteiro before Yi was killed. We have earlier concluded that Arnold's later statements to Monteiro were admissible. We therefore conclude the error was harmless beyond a reasonable doubt. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

## CONFRONTATION

Stumpf next contends that admitting Arnold's statements violated his right to confront the witnesses against him. U.S. Const. amend. VI; Alaska Const. art. I, § 11.

The leading case in Alaska on the confrontation clause and the co-conspirator exception to the hearsay rule is *Hawley v. State.* In *Hawley,* the Alaska Supreme Court held that a co-conspirator's statement is not admissible simply because it satisfies the co-conspirator exception to the hearsay rule. 614 P.2d at 1358. The court

held that such statements must be reliable in order to provide the jury with an adequate basis for evaluating the statement's truth, where the declarant has not testified and been subject to cross-examination. *Id.*

In *Hawley,* the court adopted certain factors indicative of reliability which had been articulated in *United States v. Snow,* 521 F.2d 730, 734–36 (9th Cir.1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976). The reliability factors are:

(1) the declaration contained no assertion of a past fact, ...; (2) the declarant had personal knowledge of the identity and role of participants in the crime; (3) the possibility that the declarant was relying on faulty recollection was remote; and (4) the circumstances under which the statements were made did not provide reason to believe that the declarant had misrepresented the defendant's involvement in the crime.

*Hawley,* 614 P.2d at 1359 (quoting *Snow,* 521 F.2d at 734). The supreme court clarified the first factor by saying that it expressed a preference for descriptions of contemporary events, as compared to past ones. 614 P.2d at 1359 n. 28. A statement need not satisfy all four factors to be admissible. *United States v. Perez,* 658 F.2d 654, 661 (9th Cir.1981); *Snow,* 521 F.2d at 734–35.

We conclude that all of the statements at issue here satisfy the standards adopted in *Hawley.* Stumpf does point out that Arnold told different versions of the shooting to different people. Monteiro testified that Arnold told him Stumpf fired all of the shots at Yi. Hailey testified that Arnold told her that Stumpf had fired twice and missed, and that Arnold had then shot Yi. Since both versions equally incriminated Arnold and Stumpf, and since there was no reason for Arnold to include Stumpf in the story if Arnold was simply trying to enhance his own image, the variations in the story do not seem to render the statements unreliable enough to be inadmissible. Aside from the issue of whether he himself shot Yi, Arnold's description of the shooting, given before the details were publi-

cized, closely matched the physical facts. Arnold allegedly told Monteiro that three shots were fired, but that two missed; that Stumpf's vehicle, the International Scout, was used; and that the shooting had occurred on Government Hill. Other witnesses confirmed these facts.

The United States Supreme Court recently held that statements which are properly admitted under the co-conspirator exception to the hearsay rule do not violate the confrontation clause. *Bourjaily v. United States*, — U.S. —, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987). We therefore conclude that admission of the co-conspirator statements did not violate Stumpf's confrontation rights under either the United States or Alaska Constitutions. Moreover, we have formerly concluded that the improper admission of these statements was harmless beyond a reasonable doubt.

### D.S.'S HEARSAY STATEMENTS

Two hearsay statements allegedly made by D.S. were admitted at trial over Stumpf's objection. On appeal, Stumpf renews his arguments that these statements did not fall within any hearsay exception and reasserts his argument that admitting these statements violated his constitutional confrontation rights.

The trial court has broad discretion in balancing the nonhearsay probative value of evidence against possible prejudice if the evidence is improperly accepted for the truth of the matter asserted. *Drumbarger v. State*, 716 P.2d 6, 11 (Alaska App.1986). The court's determination that evidence may be admitted for its nonhearsay relevance, in spite of possible prejudice, may be reversed for an abuse of discretion. *Id.*

Anchorage Police Officer Joseph B. Austin testified about information concerning Donald Smith which he had received from Alaska State Trooper Corporal Weatherly, who was stationed in Kotzebue when Yi was killed. On redirect examination, Austin testified that Corporal Weatherly had called Austin and said that Smith told him that D.S. had offered Smith $5,000

to kill Yi several weeks before the murder occurred. The state points out that Stumpf had asserted several times during his opening statement that the police had information suggesting Smith was a suspect, but that for their own reasons, they had pursued Stumpf and had disregarded other leads. In cross-examining Austin, defense counsel asked him whether he assumed Stumpf was guilty. On redirect, Austin offered the information that Smith had voluntarily gone into the police station and told the police that he had turned down an offer from D.S. to kill Yi for money as one of his reasons for not further investigating Smith. In addition, Investigator Austin ruled Smith out as a suspect in Yi's murder because Smith's physical appearance did not match the physical description of either of the men who had shot Yi. The trial court had admitted Smith's hearsay statement for the purpose of showing why the police did not further investigate Smith. Judge Ripley instructed the jury that it was not to consider the hearsay statements for their truth, but only for their effect on Austin's decision-making process.

Given the defense's attack on the inadequacy of the police investigation, we believe that the trial judge could properly admit the evidence of Smith's statement to Corporal Weatherly. Although there certainly is the possibility that the jury could use the evidence improperly, we note that the statements did not implicate Stumpf. We conclude that the trial court did not err in admitting this evidence for the nonhearsay purpose of shedding light on the reasons why the police investigation proceeded as it did.

Yi's widow testified that shortly before her husband's death, her husband told her that D.S. had called and demanded $10,000. Mrs. Yi testified that she and her husband did not owe D.S. any money for the purchase of the tailor shop at that time. Although the parties dispute the source of Mrs. Yi's knowledge, she testified at trial that she had overheard part of the call, and that when she questioned her husband, he told her that it had been D.S. demanding $10,000. Stumpf contends that this testi-

mony was hearsay and that admitting it violated his right to confrontation. D.S.'s statement to Mr. Yi was not hearsay. It was a demand, not a factual assertion. Mr. Yi's report to Mrs. Yi of D.S.'s statement was admissible as a present sense impression. Alaska Evidence Rule 803(1) provides that hearsay is admissible if it is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter." Reports about the contents of a telephone call made by the call's recipient to a third party, immediately after the call terminates, are admissible under this rule. *United States v. Peacock*, 654 F.2d 339, 350 (5th Cir.1981), *cert. denied*, 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983).

▮▮▮▮▮ We conclude that neither of the statements involving D.S. were admitted in violation of Stumpf's confrontation rights. An out-of-court statement admitted for a nonhearsay purpose does not violate an accused's right to confront the prosecution's witnesses. *See Tennessee v. Street*, 471 U.S. 409, 413–17, 105 S.Ct. 2078, 2081–83, 85 L.Ed.2d 425 (1985). Generally, long established exceptions to the hearsay rule do not violate the defendant's confrontation rights. *Bourjaily v. United States*, 107 S.Ct. at 2782–83; *Lipscomb v. State*, 700 P.2d 1298, 1308 n. 10 (Alaska App.1985). We further note that neither statement directly implicated Stumpf.

### HEARSAY STATEMENTS

▮▮▮ Stumpf next argues that it was error to introduce the statements that Robert Hester allegedly made to Barbara Hester and Investigator Austin. Stumpf contends that these statements were inadmissible hearsay. The state argues that the statements were admissible as prior consistent statements under Evidence Rule 801(d)(1)(B).

Robert Hester testified at Stumpf's trial. Hester testified that, in December of 1982, Stumpf had asked Hester if he wanted to help Stumpf "waste" someone. Hester also related two conversations which he had with Stumpf after Yi's murder. On January 13, 1983, Stumpf told Hester he was hiding out because police knew he had committed the murder. On January 22, 1983, Stumpf told Hester that the police were after Arnold. At trial, Stumpf's attorney cross-examined Hester. He challenged Hester's recollection and his motives in making these statements. The state rehabilitated Hester by showing that he had made similar statements to investigator Austin and to Barbara Hester. We believe that this testimony could properly be admitted as a prior consistent statement. *See Nitz v. State*, 720 P.2d 55, 67–68 (Alaska App.1986).

Stumpf argues that there were several other instances in which hearsay evidence was improperly admitted. We have reviewed Stumpf's claims and conclude that the trial court did not commit reversible error.

### WITNESSES' STATEMENTS CONCERNING STUMPF'S GUILT

Several witnesses made statements at trial relating to their belief in Stumpf's guilt. Other witnesses testified that third parties had expressed a belief in Stumpf's guilt to them.

Alaska Evidence Rule 701 provides:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based upon the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

The Commentary to A.R.E. 704, which eliminated the objection to opinion testimony embracing the ultimate issue at trial, specifically states that "[u]nder this rule an opinion of any person that a criminal defendant is guilty or innocent would not be admissible." Commentary to A.R.E. 704 at 356. These statements, however, must be looked at individually within the context of this case. In none of these instances was the opinion evidence offered as an expert opinion that Stumpf was guilty.

### A. Jackie Arnold's Opinion

■ Jackie Arnold is the wife of Stumpf's codefendant, Timothy Arnold. On direct examination, the prosecutor asked Mrs. Arnold if she had thought that her husband might have been involved in the murder when he gave her $500 about two days after the shooting. Defense counsel objected on the ground that the question was leading. This objection was overruled. Mrs. Arnold said that she had an idea that he might have participated. Later, on direct examination, Jackie Arnold testified that Sherry Schroeder had thought that Stumpf and Arnold had committed the murder. Although defense counsel had a standing hearsay objection to this testimony, he did not assert an opinion objection. We conclude that Stumpf did not properly object to either portion of Arnold's testimony. We note that in cross-examining Schroeder, defense counsel elicited her opinion that Stumpf was guilty. Thus, the testimony concerning Schroeder's opinion was cumulative of the earlier opinion. We decline to find plain error.

### B. Testimony About Dennis Brown's Opinion

#### 1. Brown's Testimony

■ Dennis Brown initially testified that Stumpf was not acting strangely when he drove Stumpf downtown on the morning following the murder. The prosecutor challenged Brown's assertion at trial by asking whether he had previously told someone that, based upon Stumpf's strange behavior, he thought that Stumpf had committed the murder. Brown had told the grand jury that he had told Schroeder that he thought Stumpf had committed the murder because of the way Stumpf had been acting. Apparently, Schroeder had said something to Brown about Stumpf acting strangely. Brown admitted making these statements to Schroeder. Stumpf did not object. In cross-examining Brown, defense counsel read a passage from Brown's grand jury testimony which clarified this testimony, but which also repeated Brown's opinion about Stumpf's guilt. Stumpf's failure to object means that this testimony

may only be reviewed for plain error, and counsel's repeating Brown's opinion from the grand jury testimony negates any claim of prejudice.

#### 2. Barbara Hester's Testimony

■ On direct examination, Dennis Brown denied having told Barbara Hester that Stumpf's behavior caused him to believe that Stumpf had committed the murder. There was no defense objection to the state's question. Before Barbara Hester testified, Stumpf asked the court for an order barring her from testifying about Brown's opinion as to Stumpf's guilt. The state argued that it wished to question Hester on this issue only to impeach Brown's testimony. The court ruled that the state could impeach Brown through testimony about his statements.

Over Stumpf's objection, the court allowed the prosecution to ask Barbara Hester if Brown had expressed his opinion about Stumpf's guilt to her. When Hester gave a nonresponsive answer, the court, over Stumpf's objection, allowed the state to read a portion of Hester's grand jury testimony. The prosecutor read her testimony that Brown had believed that Stumpf committed the murder because Stumpf had (1) told inconsistent stories about what had happened to the Scout, and (2) cleaned out the Scout after the murder.

■ The trial court erred in admitting this testimony. Although the testimony did impeach Brown, the evidence of the grand jury testimony overemphasized Brown's opinion of Stumpf's guilt. Given the fact that similar testimony had earlier come into the trial without objection, however, we conclude that admission of this testimony was harmless error. *See Chapman*, 386 U.S. at 24, 87 S.Ct. at 828.

#### 3. Andreas' Testimony

■ Anthony Andreas was allowed to testify, over objection, that Brown had told him that Brown thought Stumpf had committed the murder. The state concedes this testimony was erroneously admitted. It was not admissible as a prior inconsistent statement because Brown was never

asked about possible statements he made to Andreas. We find, however, this testimony to be cumulative and the error to be harmless. *See, id.*

### C. Testimony About Barbara Hester's Opinion

#### 1. The Scout

■ Barbara Hester testified that Stumpf told her the Scout had been stolen. A week later, Hester told Stumpf that she did not believe his story about the Scout being stolen. Stumpf then told her that he had sold the Scout on December 28. The prosecutor asked Hester if she believed Stumpf's story that he had sold the Scout. The court overruled Stumpf's objection, holding that the testimony was admissible to show what action Hester took. The court gave a cautionary instruction to the jury.

Hester stated that she did not believe Stumpf sold the Scout because he did not have the registration. She said she did not want to press Stumpf for details because she did not want to hear any more about it. Hester's testimony is arguably permissible to show the context of Stumpf's statements and to explain why she did not confront Stumpf about this second statement. Given the fact that several witnesses testified that Stumpf gave conflicting stories about what happened to the Scout, and given other testimony that established that Stumpf had access to the Scout the morning after the murder, it does not appear that the prejudicial effect of this testimony outweighed its probative value. *See* A.R.E. 403.

#### 2. The Phone Call

■ Robert Hester testified on direct examination that Stumpf had essentially confessed to him in a January 13 telephone call. Hester testified that he told his wife about the call immediately after getting off the phone. On cross-examination, defense counsel challenged the accuracy of Hester's recollection of the conversation by referring to various police reports in which Hester had reported the wording of the conversation differently.

The prosecutor asked Barbara Hester about her husband's report of the conversation. She said that Robert had told her that Stumpf admitted that he and Arnold had committed the murder. The prosecutor next asked what her reaction had been. Hester hesitated to answer, remarking that she was afraid her answer would draw a defense objection. The court asked defense counsel if he wished to enter an objection to Barbara Hester's testimony; counsel did not do so. Barbara Hester stated that, at that point, she more or less "believed that Cowboy had shot the guy."

The court overruled defense counsel's motion to strike the answer as being based on hearsay. Judge Ripley admitted the testimony to show the basis for Hester's subsequent actions. The court also admonished the jury that Hester's belief did not establish the truth of what she thought, again stating that the statement was admitted simply to explain what action Hester took next. Hester then testified that she and her husband talked about Stumpf's admission.

We conclude that the trial court did not err in refusing to grant the motion to strike. Defense counsel was given ample opportunity to object and did not do so. Once the testimony had come into evidence, the trial court's instruction should have been as effective as a motion to strike. Hester's testimony about her reaction to her husband's statement does not appear to have had any realistic impact in light of the fact that, according to her testimony, her husband had just told her that Stumpf had confessed to the crime. We accordingly find no error.

### D. Arvard Holts' Opinion

■ Arvard Holts testified that he talked to Stumpf at the Irish Setter bar on February 10, 1982. Holts stated that he had thought Stumpf was involved in the murder and tried to get Stumpf to talk about it. On cross-examination, the defense tried to establish that part of Holts' motivation in attempting to get Stumpf to talk was to help the police in order to earn a $10,000 reward. On redirect examina-

tion, the prosecutor asked Holts whether he had ever believed that Stumpf was innocent. After Holts replied he had initially thought that Stumpf was innocent, the court sustained a defense objection that the testimony was cumulative. Given the fact that the defense did not object to Holts' testimony on direct, and made a late objection which did not raise the opinion issue on redirect, this testimony may be reviewed only for plain error. We do not find plain error.

### E. Jennie Sather's Opinion

■ Jennie Sather corroborated Monteiro's testimony about calls which he received from Stumpf. Monteiro indicated that Stumpf called him frequently to tell him to keep his mouth shut. Sather testified about a telephone call which she received from Stumpf. Stumpf told her to tell Monteiro to keep his mouth shut. Following Stumpf's arrest, he continued to call Monteiro. Stumpf also called Sather several times, telling her to come to see him in jail. When Sather said she refused Stumpf's request, the prosecutor asked her reasons. Sather responded that she believed Stumpf was guilty. The defense asked the court to strike this answer, but the court found it admissible to explain Sather's actions. The court also cautioned the jury that Sather's opinion was not relevant to establish guilt. As we have stated before, we believe that the trial court's instruction to the jury as to the proper way to regard the testimony was as effective as a motion to strike. We accordingly conclude that the trial court did not err in refusing to strike this testimony.

### ADMISSION OF PRIOR BAD ACTS

■ Evidence of the prior bad acts of a defendant are not admissible to demonstrate the defendant's propensity to commit criminal acts. Such evidence may be admissible, however, when it proves something other than mere propensity. This evidence, however, is presumed to be highly prejudicial and may be admitted only when the trial court determines that the nonpropensity relevance outweighs the pre-

sumed prejudicial effect. A.R.E. 404(b); A.R.E. 403; *Lerchenstein v. State,* 697 P.2d 312, 315–16 (Alaska App.1985), *aff'd,* 726 P.2d 546 (Alaska 1986).

Stumpf first argues that the trial court admitted evidence which indicated that Stumpf had committed prior crimes. The trial court admitted transcripts of a recorded conversation between Stumpf and Arvard Holts containing several statements that Stumpf argues were objectionable. We have reviewed the statements about which Stumpf complains. We conclude that none of these statements are unduly prejudicial and, accordingly, find no error.

■ Stumpf next argues that the trial court erred in admitting evidence that Stumpf had retrieved a silencer from Anthony Andreas' car when Andreas was arrested. Andreas had previously testified that Stumpf had asked him to make a silencer for his gun, and other witnesses testified that Stumpf had said something to them about needing a silencer. Because of this, Andreas' subsequent testimony about Stumpf keeping his silencer for a short period of time does not seem unduly prejudicial. Admission of this evidence had some probative value in showing how Stumpf had learned that Andreas was familiar with silencers.

■ While Stumpf was in custody before trial, the state obtained a search warrant to seize Stumpf's address book which he had in his possession. Police officers went to the jail, showed Stumpf the warrant, and demanded that he turn over the address book. Stumpf first asked to see his attorney. He then said that the search warrant did not include some business cards which had been in the address book. When the officers asserted that the cards were included, Stumpf bit off a piece of one of the cards before releasing them. Before trial, defense counsel moved to bar evidence of this incident. During trial, Stumpf objected to its introduction. Counsel argued that this incident was not probative of any issue at trial, and that it was prejudicial in showing that Stumpf had been custody. The court ruled the evidence was admissible.

 While evidence of a person's refusal to consent to a search is inadmissible, evidence of a person's physical resistance can be admissible. *Elson v. State,* 659 P.2d 1195, 1201–02 (Alaska 1983). It appears that evidence of Stumpf's eating the business card was relevant to his consciousness of guilt. Stumpf concedes that, under the facts of this case, it was inevitable that the jury would find out that he was incarcerated. Accordingly, the trial court could properly conclude that there was minimal prejudicial impact from admission of this evidence. We find no error.

Several witnesses were allowed to testify, over defense objection, about an incident in early February 1983, in which Arnold dressed as a woman to escape the police. Two witnesses briefly mentioned the incident, while one other described it in greater detail. Stumpf argues that Arnold's acts were interpreted by the jury as an assertion of Arnold's guilt, and were therefore hearsay. He also asserts that a codefendant's efforts at flight are irrelevant, and that admitting this testimony without allowing Stumpf to cross-examine Arnold violated Stumpf's confrontation rights. Stumpf further argues that the testimony was more prejudicial than probative.

 Generally, evidence of a codefendant's flight is not admissible against other co-conspirators as proof of their guilt. *United States v. Allocco,* 234 F.2d 955, 956 (2nd Cir.), *cert. denied,* 352 U.S. 931, 77 S.Ct. 231, 1 L.Ed.2d 165 (1956); *Chavarria v. United States,* 505 A.2d 59, 63 (D.C.App.1986). *See also* 3 C. Torcia, *Wharton's Criminal Evidence,* § 643 at 336 n. 27 (13th ed. 1973). Courts do allow evidence of a co-conspirator's postconspiracy acts manifesting guilt, however, not to demonstrate the defendant's guilt, but rather to prove that a conspiracy existed and to show that a person other than the defendant knew of and participated in a criminal enterprise. *See generally United States v. Araujo,* 539 F.2d 287, 289 (2nd Cir.), *cert. denied,* 429 U.S. 983, 97 S.Ct. 498, 50 L.Ed.2d 593 (1976).

 It appears that the evidence concerning Arnold's dressing up to evade the police was improperly admitted. Only one witness testified in any detail about the incident, however, and the testimony was quite brief. The testimony lasted only a few minutes in a several-month long trial. We conclude, therefore, that the admission of this testimony was harmless beyond a reasonable doubt. *See Chapman,* 386 U.S. at 24, 87 S.Ct. at 828.

Before Ann Stockard testified, defense counsel requested a protective order barring her from testifying about anonymous threats she had received over the telephone. The trial court denied this request. Stockard testified that she had received two threatening calls from people she could not identify. She also received numerous late-night calls during which the caller would not speak. Stockard testified that she believed Stumpf was behind the calls because no one else had a motive to make them. Stumpf contends this testimony was irrelevant and prejudicial because no evidence linked the threats to him.

 Evidence that a third party attempted to intimidate a witness is admissible against a defendant as manifesting a consciousness of guilt. The state, however, must first establish that the defendant authorized the actions. The defendant's connection to the threats may be shown by direct or circumstantial evidence. *Wortham v. State,* 617 P.2d 510, 512 (Alaska 1980). In *Wortham,* such evidence was admissible when the defendant had told someone that his friends had made threats against witnesses and also vandalized a witness's home. *Id.* at 512–13.

 Stockard testified that Stumpf had called her every two or three days after she testified at the first grand jury proceeding. He had previously made statements that made her think that people who testified against him would be hurt. Stumpf told Stockard, on several occasions, to keep her mouth shut. Stumpf told Stockard that he was going to marry Sherry Schroeder to prevent her from testifying against him. Stumpf also told Stockard that he would have Dennis Brown's house

burnt down if Brown's testimony hurt him. Stockard testified at trial that she had lied at the second grand jury proceeding because the various telephone calls had frightened her. On cross-examination, defense counsel emphasized Stockard's having lied to the grand jury.

Against this background, it does not appear that the trial court abused its discretion in allowing Stockard to testify that she had lied out of fear induced by the threats that she received. We find no error.

■ Stumpf purchased the alleged murder weapon from Gerald Parent. Parent testified that he obtained the pistol from Gordon Sandland. Sandland testified at the second grand jury hearing, but not at trial. Defense counsel objected to testimony concerning alleged threats made against Sandland, but the court allowed the testimony. We conclude that there was sufficient circumstantial evidence that the threats relayed to Sandland originated from Stumpf. We accordingly find no error.

■ Stumpf's counsel moved to exclude testimony about alleged threats that Stumpf made against Dennis Brown. Stumpf also objected that this testimony would have informed the jury that he was in custody during the trial. The trial court admitted the testimony.

There does not appear to be any error in admitting this evidence. Several witnesses identified Stumpf's voice, including one who heard Stumpf use the initials "D.B." in connection with the threats. It was for the jury to evaluate the testimony of Michael Bowlin, a fellow inmate of Stumpf, regarding the threats made against Dennis Brown. As stated earlier, Stumpf concedes that it was inevitable that the jury would learn that he was in custody during this trial. We find no error in admitting this testimony.

## RESTRICTIONS ON DEFENSE EVIDENCE

The state presented evidence of statements that Stumpf made to Robert Hester, Barbara Hester, and Arvard Holts. Stumpf appeals the trial court's ruling which prevented him from presenting further evidence of statements he made to those people. Some of those statements were recorded.

■ Generally, defendants may not offer their own statements into evidence because they are hearsay. *State v. Agoney*, 608 P.2d 762, 764 (Alaska 1980). When the state, however, presents one part of a conversation or statement, or one conversation in a series, the defendant may be entitled to offer or require the state to offer, the rest of the statement or conversations in order to set the context for statements already in evidence. *See* A.R.E. 106; *United States v. Walker*, 652 F.2d 708, 710–13 (7th Cir.1981). Nonetheless, the omitted portions of the statement need not be admitted if they are not relevant to explain or clarify the previously admitted statement. *United States v. Smith*, 794 F.2d 1333, 1335–36 (8th Cir.), *cert. denied*, — U.S. ——, 107 S.Ct. 419, 93 L.Ed.2d 370 (1986). Whether to admit or exclude evidence under Rule 106 is within the trial court's discretion, and the trial court's ruling will be reversed only for an abuse of discretion. *United States v. Maccini*, 721 F.2d 840, 844–45 (1st Cir.1983).

■ Robert and Barbara Hester both testified about telephone conversations that they had with Stumpf after the murder. They also testified they had recorded some of these conversations. Robert Hester testified that Stumpf had essentially confessed in an unrecorded call, and Barbara testified to what Robert told her about the call. Robert further testified that Stumpf had told him, in an unrecorded call, that the police were after him.

The trial court barred Stumpf's attempt to introduce evidence that he had made no admissions on the recorded calls, and that, in the other calls, he had asserted that he was being framed. It appears that Stumpf was seeking to introduce evidence of calls about which the Hesters did not testify. The trial court limited Stumpf to conversations that the Hesters had testified to on direct examination.

The state argues first that Stumpf has not provided an adequate appellate record for this court to decide this issue. Stumpf apparently did not make transcripts of the contested (recorded) conversations part of the record. Nor does he cite to any point in the record which demonstrates that such statements were made. We cannot tell from the present record exactly what evidence Stumpf could have offered supporting these contentions.

It does appear, however, that any error in barring these inquiries would be harmless. Evidence of these contested statements came into evidence anyway. Defense counsel was able to elicit testimony from Robert Hester that Stumpf had told him in several recorded conversations that he was innocent. Robert Hester also admitted that Stumpf made no admissions in any of the recorded conversations. Furthermore, Robert Hester testified on cross-examination that he did remember Stumpf saying something about being framed.

Barbara Hester estimated that there were twenty recorded conversations with Stumpf. She stated that Stumpf made no admissions in any of them. Counsel also questioned Barbara Hester about a conversation in which Stumpf told her to tell the truth when speaking to the police. In cross-examining Barbara Hester, Stumpf's attorney read a letter written to her in which Stumpf had asserted that he had not killed anyone.

■■■ Arvard Holts testified that Stumpf had told him, in a recorded conversation, that he planned to leave the state and change his identity. Holts denied that Stumpf had indicated that he intended to return to Alaska to defend against the murder charge. Defense counsel sought to question Holts about another portion of the same conversation. Allegedly, Stumpf talked about previously contacting an attorney who stated that it was too early to begin assembling a defense, and also that it would be too costly to initiate a defense at that time. Stumpf offered this testimony to rebut the state's implication that he was simply fleeing the state to escape prosecution. Citing *Agoney*, 608 P.2d at 764,

the trial court refused to allow this evidence to be admitted.

We conclude that the trial court did not err in refusing to admit this testimony. Stumpf's counsel had already established, through the testimony of Robert Hester, that Stumpf wanted to leave the state to get some money and intended to come back and fight the charge. Therefore, the evidence which Stumpf sought to admit was cumulative. As such, it does not appear to shed any significant light on Stumpf's reasons for leaving the state. We accordingly find no error.

■■■ After Stumpf was arrested, he made a statement to the police. The state requested a protective order preventing Stumpf from offering evidence of this statement. Stumpf sought to question the officer who took the statement. He wanted to show that he had voluntarily made the statement. Stumpf wanted to show that he had cooperated with the police. He also wanted to show that the prosecution had his statement available, but chose not to offer it into evidence. Apparently on hearsay grounds, the trial court barred any further inquiry on this matter.

Stumpf's cooperation with the police and the fact that he made a statement was relevant, albeit marginally, to establish a lack of consciousness of guilt. Admission of this evidence, however, could obviously cause the jury to speculate on the substance of Stumpf's statement. Stumpf's statement to the police would normally be inadmissible evidence. *Agoney*, 608 P.2d at 764. We conclude, therefore, that the trial judge could properly hold that the prejudicial impact of the fact that Stumpf made a statement outweighed any marginal probative value of this evidence.

## CROSS–EXAMINATION

■■■ Stumpf next argues that the trial court improperly restricted his right to cross-examine the witnesses against him. The trial court violates a defendant's right to confront the prosecution's witnesses, guaranteed by the sixth amendment to United States Constitution and article I,

section 11 of the Alaska Constitution, when the court unduly restricts the defendant's cross-examination. *Davis v. Alaska,* 415 U.S. 308, 315–19, 94 S.Ct. 1105, 1110–12, 39 L.Ed.2d 347 (1974). Generally, the scope of cross-examination is a matter within the trial court's discretion. Cross-examination is an important right, however, and the trial court must afford the defendant broad latitude in cross-examining a witness, particularly concerning evidence of bias. *Evans v. State,* 550 P.2d 830, 836–39 (Alaska 1976). An abuse of discretion occurs only when the jury did not otherwise receive information adequate to allow it to evaluate the bias and motives of a witness. *United States v. Ray,* 731 F.2d 1361, 1364–65 (9th Cir.1984).

We have reviewed the various restrictions on cross-examination complained of by Stumpf. We conclude that Stumpf was given a full and fair opportunity to cross-examine the witnesses. We accordingly find no error.

## CLOSING ARGUMENT

Stumpf next argues that numerous aspects of the prosecutor's closing argument were improper. Stumpf concedes that he did not object to many of the matters which he now claims were improper argument. We have reviewed the arguments that were presented in this case. We do not find reversible error.

## JURY INSTRUCTIONS

■ Stumpf contends that the trial court erroneously refused to give various jury instructions that he requested. Stumpf first argues that the trial court erred in not giving a specific instruction covering his theory that he was framed. We have reviewed the instructions and conclude that the instructions which the trial court gave were fully adequate to allow Stumpf to argue his theory of defense to the jury. We accordingly find no error. *See Wortham v. State,* 689 P.2d 1133, 1143 (Alaska App.1984).

■ Stumpf next argues that the trial court erred in failing to give an instruction which covered the fact that certain witnesses had admitted to giving perjured testimony. Judge Ripley refused to give Stumpf's proposed instructions that called for the jury to distrust an admitted perjurer's testimony. The trial court apparently believed the standard witness credibility instructions were adequate.

Stumpf cites no cases reversing a conviction for failure to give such an instruction. The cases consistently hold that instructions on witness credibility, evaluating the testimony of informers or accomplices, and the significance of impeaching by prior inconsistent statements, negate the need for a specific perjurer instruction. The instruction which the trial court gave adequately covered this area. *See United States v. Tamura,* 694 F.2d 591, 602 (9th Cir.1982); *United States v. Watson,* 623 F.2d 1198, 1205–06 (7th Cir.1980).

■ Stumpf next argues that Judge Ripley erred in not giving a requested instruction which would have warned the jury to view alleged statements by Arnold, a codefendant, with caution. Stumpf cites no cases requiring this type of instruction. The only case on point upheld a trial court's refusal to give an instruction similar to the one Stumpf requested. *United States v. Regilio,* 669 F.2d 1169, 1178 (7th Cir.1981), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982). Accordingly, we find no error in refusing to give the proposed defense instruction.

■ Stumpf next challenges the trial court's refusal to instruct the jury not to consider Monteiro's guilty plea as evidence of Stumpf's guilt. In the present case, Monteiro pled guilty to hindering prosecution. He was not, however, accused of participating in the killing or of cooperating with Stumpf. Neither did Monteiro claim to have first-hand knowledge of the killing. The state offered evidence of its agreement with Monteiro to plead guilty in exchange for dropping perjury charges. Stumpf cites no point in the record where he objected to introduction of this evidence. Presumably, Stumpf desired its introduction to show Monteiro's cooperation with the prosecution and the rewards that he

received for testifying against Stumpf. Stumpf does not cite any point in the record where the state argued that Monteiro's plea was evidence of Stumpf's guilt. Defense counsel argued during his closing, that Monteiro's testimony was not credible because of the state's agreement to drop the perjury charges. Against this background, it does not appear that the trial court was required to give the jury any instruction concerning Monteiro's plea of guilty. We accordingly find no error.

■ Stumpf next argues that the trial court's failure to specifically instruct the jury not to consider Stumpf's custodial status as evidence of his guilt was error. The jury was instructed not to be biased against Stumpf because he had been arrested, charged, and brought to trial. Defense counsel, however, had specifically requested language concerning Stumpf's custodial status to be added to the instruction which was given. Judge Ripley agreed to instruct the jury to disregard Stumpf's being in custody. The state also agreed to the inclusion of language addressing the custody issue. Apparently, an oversight prevented the language from being added to the court's instruction before it was given.

It seems clear that the court would have cured this omission had it been brought to its attention by Stumpf. Apparently, however, none of the parties noticed this omission. Therefore, under these circumstances, we conclude that the instruction which the trial court gave was adequate. We find no reversible error.

## CUMULATIVE ERROR

■ We have formerly recognized that the cumulative effect of erroneous admissions of evidence may result in reversal. *Pletnikoff v. State*, 719 P.2d 1039, 1045 (Alaska App.1986). In several parts of this opinion we have found error, but concluded the error was harmless. We have also considered the cumulative effect of the er-

roneous admissions of evidence in this case. We find no grounds for reversal.

The conviction is AFFIRMED.

SINGLETON, Judge, concurring.

I concur in the judgment in this case. I am troubled that a number of legal errors occurred during this protracted trial. I am particularly concerned by the trial court's handling of the co-conspirator exception to the hearsay rule, both in the rulings on testimony before the grand jury and rulings regarding testimony at trial. Many of Arnold's casual statements to bystanders were admitted on the theory that they were made in furtherance of a conspiracy to collect money from T.S. for the murder of Hui Yi. This theory is not persuasive. After careful review of the record, however, and an evaluation of the arguments made in the parties' briefs, I am satisfied that the errors which occurred were harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). I reach this conclusion both with regard to the errors viewed in isolation and their possible cumulative impact. I am satisfied beyond a reasonable doubt that the jury verdict against Stumpf was not influenced by the errors that occurred, but resulted from the overwhelming admissible evidence against him.[1]

1. The majority has elected to publish an opinion in this case despite the rather cursory treatment it gives to many of the issues. I fear that readers of the majority opinion may misinterpret it, causing significant errors in other cases.