Timothy E. ARNOLD, Appellant,

v.

STATE of Alaska, Appellee.

No. A–442.

Court of Appeals of Alaska.

Feb. 11, 1988.

Brant McGee, Public Advocate, Office of Public Advocacy, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

On December 29, 1982, Hui Yi was shot and killed by two men who escaped in a white and yellow International Scout with Colorado license plates. On February 18, 1983, Timothy E. Arnold and Donald Stumpf were indicted for the murder. Arnold and Stumpf were tried separately. During Arnold's trial, the state argued that Arnold and Stumpf were hired to kill Yi. A jury convicted Arnold of first-degree murder, and Judge J. Justin Ripley sentenced him to ninety-nine years' imprisonment. Arnold appeals, challenging his conviction and sentence on numerous grounds. We affirm.

## GRAND JURY ISSUES

Prior to trial, Arnold and Stumpf jointly moved to dismiss the indictment. They contended that hearsay statements of D.S. were presented to the grand jury without sufficient justification, and each defendant argued that hearsay statements of the other were inadmissible at trial and, therefore, should not have been admitted at grand jury. They further argued that the indictment was based on the perjured testimony of Tyrone Monteiro. The superior court rejected these arguments and denied the motion to dismiss.

Arnold renews these contentions on appeal. He also contends, for the first time, that his indictment was tainted by the perjured testimony of another witness, Ann Stockard, who, according to Arnold, lied to the grand jury about her relationship with Stumpf and her knowledge of Stumpf's involvement in the homicide.

Hearsay may not be presented to the grand jury absent "compelling justifica-

tion." Alaska Criminal Rule 6(r). Where hearsay is improperly presented to the grand jury, the reviewing court determines whether sufficient admissible evidence was presented to justify the indictment and, if so, whether the improper evidence appreciably affected the outcome of the proceedings. *Oxereok v. State,* 611 P.2d 913, 916 (Alaska 1980); *Newman v. State,* 655 P.2d 1302, 1306 (Alaska App.1982).

In the present case, six witnesses testified before the grand jury concerning numerous statements Stumpf made prior to and after the homicide. Three of these witnesses testified about conversations they had with Stumpf in which Stumpf discussed his efforts to flee the state. Dennis Brown testified about various statements Stumpf made to him about going to Kotzebue. Robert Hester testified that Stumpf solicited him to help Stumpf "waste someone." Finally, Investigator Michael Grimes testified to the content of an interview he had with Stumpf after Stumpf's arrest. During the interview, Stumpf related an alibi involving Arnold. Grimes pointed out the inconsistencies in Stumpf's statements. Arnold argues that these statements were inadmissible and violated Criminal Rule 6(r).

■ In *Stumpf v. State,* 749 P.2d 880 (Alaska App.1988) we held that the likelihood of a codefendant's invocation of fifth amendment rights provides the compelling necessity required to admit the hearsay statements of a codefendant before the grand jury. *See also Preston v. State,* 615 P.2d 594, 598–99 (Alaska 1980); *Galauska v. State,* 527 P.2d 459, 465 (Alaska 1974), *modified on rehearing on other grounds,* 532 P.2d 1017 (1975). Our decision in *Stumpf* is controlling here. We find no error.

■ The hearsay statements of D.S. were presented to the grand jury through the testimony of Donald Smith. The trial court ruled the testimony admissible as a verbal act. On appeal, Arnold argues that the statements are inadmissible hearsay. In *Stumpf,* we concluded that D.S.'s statements were admissible to show his desire and willingness to kill Yi. Again, our deci-

sion in *Stumpf* is controlling. D.S.'s hearsay statements were not improperly admitted before the grand jury.

Next, Arnold contends that perjured testimony was improperly presented to the grand jury. Arnold argues that the trial court's failure to dismiss the indictment or, in the alternative, to order the state to present the case anew to the grand jury violated his rights to due process of law and to an impartial grand jury.

Tyrone Monteiro testified before the grand jury on February 17, 1983. Monteiro falsely told the grand jury that he had never discussed the killing with Arnold and that Arnold did not tell Monteiro anything concerning Stumpf's involvement in the killing. Monteiro also lied about Arnold's appearance when he saw Arnold after Hui Yi was killed. Finally, Monteiro falsely testified that when Arnold and Stumpf left Arnold's apartment at around 8:00 o'clock on the night of the murder, Arnold said that he and Stumpf were "going to do a job" on Government Hill—that they were going to remodel some bathrooms.

After Monteiro testified before the grand jury, the police received information that Monteiro not only had lied to the grand jury, but that he also had helped Arnold dispose of the murder weapon. When the police contacted Monteiro about five days after his grand jury appearance, he acknowledged his false testimony and admitted helping Arnold recover and dispose of the pistol. Monteiro then showed the police where the gun was. Monteiro was indicted for perjury and hindering prosecution. Pursuant to an agreement with the state, he pled guilty to the hindering prosecution charge and, in exchange for the state's dropping the perjury counts, promised to testify against Stumpf and Arnold. At trial Monteiro admitted lying to the grand jury. Monteiro's trial testimony against Arnold was highly incriminating.

■ When false testimony is presented to the grand jury without knowledge or complicity of the state, an indictment need not be dismissed if the perjured testimony is immaterial and the evidence is otherwise

sufficient to support the indictment. *Miller v. State*, 629 P.2d 546 (Alaska App. 1981). In *Stumpf*, we held that there must be some showing of prejudice before dismissal is warranted. Given that Monteiro told a far more incriminating story at Arnold's trial, Arnold suffered no prejudice from Monteiro's false testimony to the grand jury. Ample evidence apart from Monteiro's testimony was presented to the grand jury. We find that Arnold's rights to due process and an impartial grand jury were not violated by the use of Monteiro's perjured grand jury testimony. The trial court did not abuse its discretion by denying Arnold's motion to dismiss.

Arnold also alleges that Ann Stockard perjured herself before the grand jury. Arnold infers from Stockard's trial testimony that her grand jury testimony was perjured. This issue, however, was not raised below. Further, it does not appear that any allegedly perjured statement by Stockard would have been material to the grand jury's decision to indict. We find no error.

Arnold's final challenge to his indictment is based on the prosecutor's failure to inform the grand jury of Monteiro's and Stockard's perjury. Arnold contends that the prosecutor had a duty to present this evidence because it undermined the credibility of the inculpatory testimony rendered by the two perjured witnesses.

In *Baumann v. United States*, 692 F.2d 565 (9th Cir.1982), the court stated that if the prosecutor did not knowingly rely on perjured testimony, "failure to disclose the allegedly exculpatory evidence would be a violation of due process only if ... the omitted evidence would have created a reasonable doubt that did not otherwise exist." *Baumann*, 692 F.2d at 572. Here, the grand jury had sufficient evidence to indict Arnold without the perjured testimony of Monteiro and Stockard. Because Monteiro's and Stockard's presumably unperjured trial testimony was far more incriminating than their grand jury testimony, evidence of the lack of credibility before the grand jury would not have created a reasonable doubt that did not otherwise exist. We find that the prosecu-

tor did not violate his duty by failing to apprise the grand jury of Monteiro's and Stockard's perjury.

## MOTION TO CHANGE VENUE

Arnold argues that adverse pretrial publicity denied him his constitutional rights to a fair trial, confrontation and cross-examination, and effective assistance of counsel. Prior to trial, Arnold reserved his right to move for a change of venue following jury voir dire on grounds that adverse pretrial publicity made a fair trial in Anchorage impossible. During voir dire, Arnold moved several times to change venue; his motions were denied. After the jury was seated, Arnold renewed his motion, and it was again denied. On appeal, Arnold claims that the trial court erred in denying his motions.

The right to a jury trial guarantees the defendant a fair trial by a panel of impartial jurors. To be impartial, a juror need not be unaware of the facts of a case. As the Supreme Court has stated:

> It is not required ... that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin v. Dowd*, 366 U.S. 717, 722–723, 81 S.Ct. 1639, 1642, 1643, 6 L.Ed.2d 751 (1961). The ultimate objective is to find twelve jurors "who would, under the proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." *Mallott v.*

*State,* 608 P.2d 737, 745–46 (Alaska 1980) (quoting *Nebraska Press Association v. Stuart,* 427 U.S. 539, 569, 96 S.Ct. 2791, 2807, 49 L.Ed.2d 683 (1976)).

The defendant bears the ultimate responsibility "to demonstrate that pretrial publicity actually resulted in 'a partiality that could not be laid aside' in those jurors finally seated to adjudicate guilt or innocence." *Mallott,* 608 P.2d at 748 (quoting *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975)). However, this responsibility is qualified if there has been "intensive pre-trial publicity, and a substantial number of venirepersons appear to have been prejudiced by the publicity . . . ." *Id.* In reviewing a lower court's denial of a motion to change venue, we make an independent evaluation of the circumstances surrounding trial and reverse only when it appears that the trial court abused its discretion. *Oxereok v. State,* 611 P.2d at 919.

In the present case, Arnold argues that he was denied his constitutional right to an impartial jury because seven jurors had knowledge of Stumpf's case and two of the seven had knowledge of Stumpf's conviction. Arnold also argues that the pretrial publicity was so pervasive and prejudicial that jury bias must be presumed. To support his argument, Arnold contends that *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), is on all fours. Arnold's argument is unpersuasive.

In *Rideau,* the defendant confessed under police interrogation to a murder in Calcasieu Parish, Louisiana. A twenty-minute film of his confession was broadcast by a Calcasieu Parish television station three times in three days. Out of a total population of 150,000 people in Calcasieu Parish, 97,000 saw the film. The defendant's trial occurred two months after the film was broadcast. Three members of the jury stated on voir dire that they had seen the film. Two members of the jury were deputy sheriffs of Calcasieu Parish. Defendant's counsel challenged these jurors for cause, but the challenges were denied and defense counsel had already exhausted all peremptory challenges. The Supreme

Court found denial of due process, holding that "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle [the filmed confession] could be but a hollow formality." *Rideau,* 373 U.S. at 726, 83 S.Ct. at 1419.

In the present case, an Anchorage television station broadcast a taped interview with John Saine, Arnold's former cellmate. In the interview, taped in jail, Saine said that Arnold admitted waiting outside Yi's Government Hill apartment with Stumpf on the night of the murder.

■ Although this interview was potentially prejudicial, Arnold has failed to show how it impacted the venire pool. There is nothing in the record to indicate that any of the prospective jurors had seen the taped interview. Only six people out of the forty-seven questioned during voir dire had previously heard anything of Arnold's involvement in the alleged crime. Three of those six were excused for cause based on pretrial publicity. Arnold challenged a fourth juror for cause but the challenge was denied. Two of the three jurors who were not excused for cause were peremptorily challenged by Arnold. The remaining juror, juror Schultz, was not challenged, either for cause or peremptorily, even though Arnold used only nine of his ten peremptory challenges.

Thus, few people in Arnold's venire pool had any prior knowledge of his involvement. Furthermore, the televised interview did not contain information that was later deemed inadmissible at trial. The trial court denied Arnold's motion to suppress the conversation between Arnold and Saine.

In deciding whether the potential for hidden prejudice exists in a given case, we must also examine the type of publicity disseminated. Much of the pretrial publicity in this case ended about three months before Arnold's trial, when Stumpf was convicted. Most articles published during Stumpf's trial were not inflammatory and did not describe incriminating evidence that was inadmissible during Arnold's trial. These articles generally summarized the testimony of witnesses in the Stumpf trial

who would eventually appear at Arnold's trial. Two articles appeared on the evening before and the morning of Arnold's trial, but they were also not inflammatory. They discussed the facts surrounding Yi's murder and briefly summarized Stumpf's trial. The only inadmissible information contained in these articles was the fact that Stumpf had been convicted.

Only two members of Arnold's jury, jurors Schultz and Warren, knew that Stumpf had been convicted. Arnold's counsel did not challenge either juror for cause or peremptorily even though he only used nine of his ten peremptory challenges. Moreover, in light of Arnold's defense, it is questionable whether a juror's knowledge of Stumpf's conviction would likely have been prejudicial. Stumpf's conviction simply was not inconsistent with Arnold's theory of defense. Arnold's counsel did not assert that Arnold was absent from the scene, nor did he contend that Stumpf was innocent. To the contrary, he characterized Stumpf as the murderer and portrayed Arnold as an innocent companion who did not know what he was getting involved in when he went with Stumpf to the scene of Yi's murder.

In addition to juror Schultz, who had previously heard of Arnold's participation and was aware of Stumpf's conviction, and juror Warren, who was aware of Stumpf's conviction, five members of Arnold's jury had some knowledge of the case, but none had any significant recollection.

Thus, although the pretrial publicity in this case was fairly pervasive, only a few members of the venire pool appear to have actually been prejudiced by it. Under these circumstances, there is no reason to presume prejudice or to question the assurances of impaneled jurors that they were capable of fairly and impartially considering the evidence. *Oxereok v. State*, 611 P.2d at 919; *Mallott v. State*, 608 P.2d at 748; *Nickolai v. State*, 708 P.2d 1292 (Alaska App.1985); *Chase v. State*, 678 P.2d 1347, 1350–52 (Alaska App.1984). We find that the trial court did not abuse its discretion by denying the change of venue.

## CHALLENGES FOR CAUSE

Arnold contends that the trial court committed reversible error by denying his challenge for cause of juror Sumpter. Arnold challenged Sumpter for cause because she admitted forming an opinion that Arnold had been the driver of the vehicle used in the homicide. She based her opinion on what she had read in the newspaper. The defense later exercised its eighth peremptory challenge to excuse Sumpter.

In *Mallott v. State*, 608 P.2d at 749–50, the supreme court adopted the American Bar Association's standards of acceptability for prospective jurors exposed to the facts of a case as reported by the media. The *Mallott*/ABA standards establish four classifications of prospective jurors, two of which require automatic disqualification for cause and two which do not. If a juror claims to be unable to put aside preconceptions or has been exposed to such highly inflammatory or incriminating material that any claim of impartiality cannot be credited, that juror is disqualified without further inquiry. On the other hand, a juror with some knowledge of the facts, or even one who admits forming an opinion about the case that is not based on highly inflammatory material, is not automatically disqualified. Rather, such a juror is subject to further inquiry regarding both the degree of exposure and the juror's resulting state of mind.

■ Although juror Sumpter formed an opinion that Arnold had been the driver of the getaway vehicle, she also stated that she could set aside what she had read about the case and base her decision solely on the evidence presented at trial. The information that Sumpter read in the newspaper was not inherently prejudicial or inflammatory. During Arnold's closing argument, Arnold's defense counsel admitted that Arnold was in the car when Stumpf shot Yi. Under the *Mallot*/ABA standard, Sumpter was not subject to automatic disqualification; her ability to serve as a juror turned on the credibility of her testimony concerning her ability to be impartial. *Mallott*, 608 P.2d at 749–50. Judge Ripley concluded that Sumpter would be able to

base her verdict solely on the evidence presented during Arnold's trial. On these facts, we find that the trial court did not abuse its discretion in denying the challenge for cause.

In any event, it would be difficult to conclude that Arnold was actually prejudiced by the trial court's ruling, since Arnold peremptorily challenged Sumpter and did not exercise all of his peremptory challenges. *McGee v. State,* 614 P.2d 800, 807 (Alaska 1980). Accordingly, any error by the trial court would have been harmless.

## REQUEST FOR ADDITIONAL PEREMPTORY CHALLENGES

Under Alaska Criminal Rule 24(d), Arnold was entitled to ten peremptory challenges. He used nine. After the jury and four alternates were seated and Arnold's final motion for change of venue was denied, Arnold moved for additional peremptory challenges. During the ensuing discussion, Arnold's trial counsel conceded that his decision not to exercise Arnold's final peremptory challenge had been a tactical one, based on the fact that the prosecution had three remaining challenges. Judge Ripley denied Arnold's request for additional peremptory challenges.

The decision whether to grant or deny a request for additional peremptory challenges is within the trial court's discretion. *Graybill v. State,* 672 P.2d 138, 139 n. 1 (Alaska App.1983), *rev'd on other grounds* 695 P.2d 725 (Alaska 1985); *Ketzler v. State,* 634 P.2d 561, 566 (Alaska App.1981). Further, a peremptory challenge that is not exercised in a timely manner—before the juror is sworn—is considered waived. *Grimes v. Haslett,* 641 P.2d 813, 816 (Alaska 1982).

Arnold's jury was already sworn and seated by the time Arnold requested additional peremptory challenges. Arnold's argument that the untimeliness should be excused because his trial counsel had no prior criminal experience is without merit. At one point during voir dire, Arnold's counsel sought a stipulation from the state for an additional peremptory challenge. He later requested an additional peremptory challenge during the selection of alternate jurors. We conclude that Judge Ripley did not abuse his discretion in finding Arnold's request to be untimely.

## CO–CONSPIRATOR STATEMENTS

Prior to trial, Arnold challenged the admissibility of Stumpf's hearsay statements under the co-conspirator doctrine. He requested that the trial court determine whether a conspiracy existed and, if so, when it began and ended. The trial court declined to rule on the matter at that juncture, but said that Arnold could raise the issue again, during trial, if he believed that the state had failed to establish the necessary foundational facts. On appeal, Arnold contends that Stumpf's hearsay statements were improperly admitted.

The state argues in response that Arnold failed to renew his objections during trial and consequently waived his right to raise this issue on appeal. The state's argument is only partly correct. Stumpf's hearsay statements were admitted through the testimony of four witnesses: Sherry Schroeder, Paula Hailey, Anthony Andreas, and Ann Stockard. Arnold properly objected to the admission of Stumpf's statements during the testimony of Schroeder and Hailey, but did not object to the statements testified to by Andreas and Stockard.

It is a fundamental rule of evidence that an objection not made in a timely manner is waived. *United States v. Jamerson,* 549 F.2d 1263, 1266–67 (9th Cir.1977). According to Judge Ripley's ruling, Arnold's counsel had a duty to raise the issue at the appropriate time with proper objections. Since Arnold's counsel failed to make a timely objection when Andreas and Stockard testified, we conclude that their hearsay testimony was properly admitted. *Byrd v. State,* 626 P.2d 1057, 1058 (Alaska 1980). Thus, the only hearsay testimony at issue is that given by Schroeder and Hailey.

Schroeder testified that she had plans to go out on the night of the murder, December 29, and that Stumpf agreed to watch her daughter. Stumpf told her he was

going to pick up Arnold and that they "had some business to take care of." Stumpf also told Schroeder that he would leave her daughter with Arnold's wife and pick her up by 9:00 p.m. that evening. Schroeder further testified that she woke Stumpf up the next morning because Stumpf had told her that he had to go to Kotzebue. Schroeder stated that, upon being awakened, Stumpf told her that his car, a Scout, had "broken down downtown." When Schroeder mentioned hearing about a shooting on Government Hill, Stumpf jumped up and grabbed the telephone. Schroeder testified that Stumpf dialed a number and stated, "I need to see you. I need some help." According to Schroeder, Stumpf returned to the apartment with Dennis Brown later that afternoon. Schroeder claimed that Stumpf was carrying some papers that had been in the Scout, including its title and registration. He threw the papers and his keys on the table and told Schroeder to hide them. Finally, Schroeder testified that Stumpf called her on the evening of December 31 and asked her to have someone pick him up at the airport.

Alaska Rule of Evidence 801(d)(2) provides that a statement is not hearsay if it is "offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." The state must establish several foundational facts by a preponderance of the evidence in order to have co-conspirator statements admitted at trial. It must show that there was an agreement to carry out a criminal plan, that the statement was made during the conspiracy's existence, and that the statement was made to further the conspiracy. *Hawley v. State*, 614 P.2d 1349, 1354 (Alaska 1980); *Adams v. State*, 706 P.2d 1183, 1187 n. 3 (Alaska App.1985).

■ Arnold argues that the state's evidence only proved his friendship with Stumpf and his presence at the scene of the murder. Arnold contends that the evidence was insufficient to establish the existence of a conspiracy. This argument is without merit. Arnold's own statements established the existence of a conspiracy to murder Yi and his involvement in the conspir-

acy. Three witnesses testified to statements made by Arnold regarding his involvement in the murder.

Nancy Stouch testified that, two days after Yi's murder, Arnold told her that he was involved in a murder, that he became involved because of Stumpf, that he received money for the murder, that Yi had "besmudged someone's honor," and that the Korean mafia had put out a contract on Yi. Susan Brock testified that Arnold talked to her about the murder. She stated that Arnold told her that he and Stumpf had been hired to murder Yi by the same man they had worked for at the Spenard Lounge. Finally, Tyrone Monteiro testified that, prior to Yi's murder, Arnold pointed out Yi's tailor shop and told him that he and Stumpf had a contract to kill the owner. Arnold told Monteiro that someone in Kotzebue had a contract out for Yi and that he and Stumpf would get $5,000 for the job. Monteiro also testified that somebody was supposed to be following Yi to determine his daily activities. We find that Arnold's statements provide sufficient evidence to support a finding that a conspiracy existed.

■ Arnold's second contention is that the state failed to meet its burden of showing that Schroeder's testimony occurred during the course of the conspiracy. He argues that the hearsay statements Stumpf made after Yi's murder occurred after the conspiracy had ended.

In *Stumpf*, we held that when one of the conspiracy's main goals is to receive money, it does not end until the money is paid. *See also, United States v. Doyle*, 771 F.2d 250, 255–56 (7th Cir.1985). Several facts, apart from the challenged statements, support a finding that Arnold and Stumpf agreed to kill Yi for money. Arnold told three people, Nancy Stouch, Tyrone Monteiro, and Susan Brock that he had been hired to kill Yi. Arnold specifically told Monteiro that he and Stumpf would get $5,000 for killing Yi. On December 31, several days after the murder, Stumpf flew to Kotzebue. Several witnesses testified that Stumpf and Arnold were broke before the shooting but that both had large sums

of money after Stumpf returned from Kotzebue. All of Stumpf's statements to Schroeder were made before Arnold received the money. We find that Schroeder's statements occurred during the course of the conspiracy.

 Finally, Arnold argues that Stumpf's statements were not made in furtherance of the conspiracy. Whether a statement was made in furtherance of the conspiracy depends on the intent of the conspirator who made it. If the statement was made with the intent to promote the conspiracy and its objectives, the "in furtherance" requirement is satisfied. *United States v. Layton*, 720 F.2d 548, 556–57 n. 5 (9th Cir.1983). Not all statements uttered by conspirators are intended to further the goals of the conspiracy. Casual admissions of guilt to third persons are not admissible. *Crump v. State*, 625 P.2d 857, 863 (Alaska 1981); *Williamson v. State*, 692 P.2d 965, 969 (Alaska App.1984). However, admissions of guilt or explanations of the conspiracy's aims or actions are admissible if the conspirator confides in persons who are not members of the conspiracy in order to induce them to provide assistance to the conspirators. *See United States v. Foster*, 711 F.2d 871, 880 (9th Cir.1983).

Here, Stumpf made several statements that furthered the objectives of the conspiracy. On the night Yi was murdered, Stumpf told Schroeder that he and Arnold "had some business to take care of" and that he would leave her daughter with Arnold's wife and pick her up by 9:00 p.m. that evening. Arnold argues that these statements were casual admissions of culpability. He relies on *United States v. Eubanks*, 591 F.2d 513, 519–20 (9th Cir. 1979). *Eubanks*, however, is inapposite. Unlike the situation in *Eubanks*, Stumpf's statements to Schroeder were more than casual information. Stumpf explained where he was going—"to take care of business" with Arnold—so that he would not have to take responsibility for Schroeder's daughter. He was not merely informing Schroeder of his activities. Rather, he was offering an explanation for his inability to take care of Schroeder's daughter in order

to assure that he would be free to go with Arnold to murder Yi. We conclude that Stumpf's pre-homicide statement was in furtherance of the conspiracy.

Stumpf also made several post-homicide statements to Schroeder. First, Schroeder testified that Stumpf told her he had to go to Kotzebue on December 30 and that she woke him up at 8:00 a.m., so he could get on a 10:00 a.m. flight. Arnold argues that this statement was either a casual admission of guilt or a statement to conceal the homicide. The argument is unpersuasive. Schroeder's testimony that she woke up Stumpf at 8:00 a.m. is not hearsay. Schroeder was describing what she did. Schroeder's testimony that Stumpf told her that he had to catch a 10:00 a.m. flight to Kotzebue was made in furtherance of the conspiracy, since Stumpf went to Kotzebue to collect the money owed for the murder, and he apparently told Schroeder his plans to ensure that she would wake him up in time to go.

Second, Schroeder testified that Stumpf told her that his Scout had "broken down downtown." This statement was clearly not hearsay since it was not offered to prove that the Scout had broken down.

 Third, Schroeder testified that Stumpf dialed a number and stated, "I need to see you. I need some help." Later, that afternoon, Stumpf asked Schroeder to hide his keys and the papers from the Scout. These statements occurred before Stumpf's trip to Kotzebue. Stumpf's statement, "I need to see you. I need some help," was not hearsay. It was not offered to prove the truth of the matter asserted, but to establish Stumpf's state of mind. We further find that Stumpf's statement to Schroeder to hide his keys and the papers from the Scout was an attempt to further the conspiracy's goals by enlisting Schroeder's aid. *See United States v. Xheka*, 704 F.2d 974, 985–86 (7th Cir.1983) (noting the distinction between acts of concealment done in furtherance of the main criminal objectives of the conspiracy and acts of concealment done after central objectives have been obtained).

Finally, Schroeder testified that Stumpf called her on the evening of December 31 to ask her to have someone pick him up at the airport. Arnold argues that this statement was clearly not in furtherance of the conspiracy's objective to murder Yi. Again, we find Arnold's argument is unpersuasive because the ultimate goal of the conspiracy included obtaining money and distributing it to Arnold. Upon his return to Anchorage, Stumpf was seeking Schroeder's cooperation in furtherance of this objective. Schroeder testified that after Stumpf was picked up from the airport, he gave her six hundred dollars. She also testified that before Stumpf got back into town, Arnold called her and told her he needed the money that Stumpf had for him. Nancy Stouch also testified that, on December 31, she saw Arnold with about four hundred dollars. Finally, Monteiro testified that after the murder, Stumpf came over to Arnold's apartment in the evening. After Stumpf left he saw Arnold with a lot of hundred dollar bills. We find no error in admission of Schroeder's testimony.

We next turn to Hailey's testimony. Hailey testified that Arnold approached Stumpf and asked when they were going to get the money. Stumpf then told Arnold that the money would arrive and not to worry about it. This statement was properly admitted by Judge Ripley on the ground that it was not offered to prove the truth of the matter asserted. Thus, it does not implicate the co-conspirator doctrine. Furthermore, Stumpf's response merely completed the exchange that occurred with Arnold. Arnold's question was far more prejudicial than Stumpf's response. Arnold's statement was an admission that he was awaiting money. The admission corroborated Monteiro's testimony that Arnold had told him that he (Arnold) and Stumpf were hired to kill Yi for money. We find no error.

## FINDINGS THAT A CONSPIRACY EXISTED

Arnold separately argues that the trial court committed reversible error by failing to make an express finding as to the existence of a conspiracy. The state concedes that the trial court failed to make such a finding.

Generally, before admitting evidence under the co-conspirator doctrine, the trial court is required to make a specific finding as to the existence of a conspiracy. *See United States v. Radeker*, 664 F.2d 242 (10th Cir.1981). In this case, however, there was overwhelming evidence that a conspiracy existed. Arnold failed to ask the trial court for specific findings concerning the existence of a conspiracy. Prior to trial, Judge Ripley ruled that Stumpf's hearsay statements would be provisionally admitted. During trial, Arnold objected to the hearsay testimony of only two witnesses, Schroeder and Hailey. Hailey's testimony was admitted without reliance on the the co-conspirator doctrine. Judge Ripley provisionally admitted Schroeder's testimony on condition that the state provide the foundational elements of a conspiracy later in the course of trial. Schroeder was the first prosecution witness called. It was therefore not unreasonable for Judge Ripley to defer ruling on the existence of a conspiracy. Moreover, it was incumbent on Arnold to make a request for such a finding by the end of trial if he thought the state failed to carry its burden and establish the existence of a conspiracy. *See Lower Kuskokwim School Dist. v. Alaska Diversified Contractors, Inc.*, 734 P.2d 62, 63 n. 1 (Alaska 1987); *Moss v. State*, 620 P.2d 674, 677 (Alaska 1980); *State v. Koloske*, 676 P.2d 456, 461 (Wash.1984).

We hold that the trial court did not commit reversible error by failing to make an express finding concerning the existence of a conspiracy.

## CONFRONTATION CLAUSE

Arnold next argues that admitting Stumpf's statements violated his constitutional right to confrontation under the United States and Alaska Constitutions. U.S. Const., amend. VI; Alaska Const., art. I, § 11.

The Alaska Supreme Court, in *Hawley v. State*, 614 P.2d at 1358–59, articulated four indicators of reliability that must be estab-

lished if hearsay statements are admitted under the co-conspirator doctrine:

> (1) the declaration contained no assertion of a past fact, ... (2) the declarant had personal knowledge of the identity and role of participants in the crime; (3) the possibility that the declarant was relying upon faulty recollection was remote; and (4) the circumstances under which the statements were made did not provide reason to believe that the declarant had misrepresented the defendant's involvement in the crime.

*Id.* at 1359 (quoting *United States v. Snow,* 521 F.2d 730, 734 (9th Cir.1975)).

 All of the challenged statements satisfy the requirements stated in *Hawley.* Stumpf's pre-homicide statements to Schroeder did not contain any express assertions of past fact. Stumpf had personal knowledge of Arnold's role in the homicide. The possibility of faulty recollection was negligible, since Stumpf was referring to future events. Stumpf's statement that he was going to take care of business with Arnold was corroborated by other evidence showing that Arnold and Stumpf were together. There is no reason to believe that Stumpf was motivated to misrepresent Arnold's involvement in the murder.

All four of the factors were also present with respect to Stumpf's post-homicide statements to Schroeder. Stumpf's statements to Schroeder on the morning of December 30 and his telephone conversation with her on December 31 were made while the conspiracy was still in existence; they contained no assertions of past facts. On both occasions, Stumpf was soliciting Schroeder's assistance on matters of immediate concern—hiding his keys and papers from the Scout and later getting a ride from the airport after he returned from Kotzebue with the money. There was no possibility of faulty recollection since the statements related to events that were taking place at the time. Again, Stumpf's statements did not implicate Arnold in the homicide. Thus, there is no basis for con-

cluding that Stumpf's statements misrepresented Arnold's involvement in the homicide.[1]

We find that admission of Stumpf's out-of-court statements did not violate Arnold's rights under the confrontation clause.

## JURY INSTRUCTIONS

Arnold argues that the trial court committed reversible error by failing to give two jury instructions.

First, Arnold argues that the trial court erred by failing to instruct the jury not to consider Monteiro's guilty plea to the charge of hindering prosecution as evidence of Arnold's guilt. Monteiro's indictment charged that he unlawfully rendered assistance to Arnold and Stumpf with the intent to hinder their prosecution by hiding the firearm used in Yi's murder. At Arnold's trial, Monteiro testified about his efforts to hide the alleged murder weapon. Arnold was also charged with hindering prosecution in the first degree. Arnold's charge arose out of the same conduct as Monteiro. However, Monteiro was not accused of participating in the killing or of cooperating with Arnold, and Monteiro did not claim to have first-hand knowledge of the killing.

 During the trial, the state submitted evidence of Monteiro's agreement with the state to plead guilty to the charge of hindering prosecution in exchange for the state's dismissal of perjury charges. Arnold cites no point in the record where he objected to introduction of this evidence. Nor does Arnold cite any point in the record where the state argued that Monteiro's plea was evidence of Arnold's guilt. As to Monteiro's credibility, defense counsel cross-examined Monteiro extensively about his admitted perjury.

In *Stumpf,* we held that the trial court was not required to give the jury any instructions about how to interpret Monteiro's guilty plea. The facts here are similar to those in *Stumpf;* we find no reason to

1. The statements that were admitted as non-hearsay without reliance on the co-conspirator doctrine—Stumpf's statement to Schroeder that the Scout broke down and Hailey's testimony regarding Stumpf's response—did not violate Arnold's right of confrontation.

depart from our holding there. We find no error.

 Arnold next argues that Judge Ripley erred in refusing to instruct the jury to view perjured testimony with caution. Judge Ripley refused to give the proposed defense instructions, which called for the jury to distrust an admitted perjurer's testimony. The judge believed the standard witness credibility instructions to be adequate. Instruction No. 3, in particular, specifically advised the jury, in relevant part, that "if you believe that a witness testified falsely as to part of his testimony, you may choose to distrust other parts also...." The witnesses at issue admitted their perjury in front of the jury and were extensively cross-examined about it. Arnold's counsel referred to the witnesses' perjury during his closing argument. Counsel also told the jury during closing argument that the amount of perjury they had heard should cause them to distrust the witnesses' testimonies.

We conclude that the instructions given by the trial court adequately covered this area.

### SENTENCING

Arnold received the maximum sentence of ninety-nine years for first-degree murder. He contends that the trial court violated its duty to independently analyze the *Chaney* sentencing factors by adopting the prosecutor's *Chaney* analysis. *See State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970).

While the sentencing goals of *Chaney* must be considered in each case, it is only when the court's remarks afford no insight into its reasons for imposing a particular sentence or when they affirmatively indicate that the sentence was not properly based on the relevant *Chaney* factors that failure to expressly articulate the *Chaney* goals will require a remand. *Smith v.*

*State*, 691 P.2d 293, 295 (Alaska App.1984). *See also Evans v. State*, 574 P.2d 24, 26 (Alaska 1978) (trial court need not recite sentencing goals as along as it is clear that it has considered them).

In *Cassell v. State*, 645 P.2d 219 (Alaska App.1982), we upheld the trial court's decision to sentence a nineteen-year-old defendant to life imprisonment. We based our decision on the fact that "crimes of violence committed on a contract basis must be deemed to be among the most reprehensible of offenses." *Cassell*, 645 P.2d at 224. Similarly, in *Lewis v. State*, 731 P.2d 68, 72–73 (Alaska App.1987), we found that the trial court was justified in finding the defendant a worst offender. The trial court based its decision on the fact that a willful, cold-blooded, contract killing is the worst kind of homicide.

 Here, Judge Ripley determined that Yi's murder was an execution-for-hire and that Arnold had done the shooting. Although Judge Ripley did not specifically address the *Chaney* factors, his remarks made clear his reasons for imposing a ninety-nine year sentence on Arnold.[2]

Having independently reviewed the sentencing record, we conclude that Arnold's sentence of ninety-nine years was not clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

---

**2.** We caution, however, that trial courts should refrain from adopting by reference the prosecution's *Chaney* analysis. The *Chaney* sentencing factors were adopted specifically so that trial courts would independently review these factors and then impose a sentence. We emphasize the importance of a thorough explanation of the sentence imposed by the trial judge. *See Amidon v. State*, 604 P.2d 575, 578 n. 7 (Alaska 1979); *Andrews v. State*, 552 P.2d 150, 153 (Alaska 1976).